Samson **DUBRIA, Petitioner–Appellant,**

v.

**G.A. SMITH, Warden, Respondent–Appellee.**

No. 98–55914.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1999.

Decided Nov. 19, 1999.

Charles M. Sevilla, Cleary & Sevilla, San Diego, California, for the petitioner-appellant.

Frederick R. Millar, Jr., Deputy Attorney General, San Diego, California, for the respondent-appellee.

Before: Pregerson, Boochever, and Hawkins, Circuit Judges.

BOOCHEVER, Circuit Judge:

This case involves a double tragedy: the sudden death of a promising young woman, and the life sentence without parole of the young doctor found guilty of causing her death as the unexpected result of his allegedly using chloroform to accomplish sexual intercourse.

Samson Dubria, a California state prisoner, appeals the district court's denial of his federal petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse because of the introduction of prejudicial evidence and improper comments made in closing arguments. The facts are set forth below in some detail because of their importance in resolving most of the claims.[1]

## I. BACKGROUND

The State of California charged Samson Dubria ("Dubria") with murdering and raping Jennifer Klapper ("Klapper") while the two were on a sightseeing trip in California. The State alleged that Dubria administered chloroform to Klapper to render her unconscious so that he could rape her, and that Klapper died after suffering a lethal reaction to the chloroform. After a jury trial, Dubria was convicted of first degree murder, rape by use of drugs, and administering a drug in order to enable and assist himself to commit a felony. [ER 1b] The jury also found the special circumstance of rape to be true, and he was sentenced to life imprisonment without the possibility of parole. [Id.]

The relevant events began in January 1990, when Klapper became friends with Dubria at the hospital in Ohio where they both worked. Klapper, who was twenty years old at the time of her death, worked in the medical library while Dubria was a twenty-eight year old resident physician. [ER 3] The relationship between Klapper and Dubria was not a romantic one. Klapper had stated that she was not physically attracted to Dubria, and at the time of her death, she was romantically involved with Christopher Eckes ("Eckes"). Klapper and Eckes had expressed their love for each other, and had talked of marriage. [Id.]

In March 1991, Dubria told Klapper that he was planning to attend a class reunion in California and asked Klapper if she wanted to go with him. Klapper was a television and movie fan, and while she was interested in going to California, she also expressed serious reservations about the trip. She told a friend that she felt uncomfortable about going with Dubria because she did not know what he expected from her. [ER 3] Klapper stated that she was not physically attracted to Dubria and did not intend to have a physical relationship with him. Klapper also expressed reservations about being away from Eckes. Klapper's sister overheard a telephone conversation in which Klapper told Dubria that their relationship was platonic, and that she had a boyfriend. Further, she told Dubria that if he expected to have a physical relationship with her while on the trip, she would have to cancel her plans to

---

1. In their briefs, both parties adopt the facts from the unpublished opinion of the California Court of Appeal, Fourth Appellate District, Division One. See People v. Dubria (In re Dubria), Nos. D018852 & D021337 (Cal.Ct. App. July 18, 1995). These facts are entitled to a presumption of correctness under former 28 U.S.C. § 2254(d).

go. In June 1991, Dubria moved to New Jersey, but continued to communicate with Klapper by telephone. [ER 14] Eventually, the two made plans to go to California together. [ER 4]

Dubria arrived in California first, and picked up Klapper at the airport on August 11, 1991. [ER 14] Klapper and Dubria spent the next several days sightseeing around California, staying at the home of Dubria's parents. [ER 15] On August 15, Klapper and Dubria headed towards the San Elijo State Beach campground where they planned to camp for the night. They did not reach the campground that night, however, but instead checked into a motel in Carlsbad, California.[2] [Id.]

At approximately 3:09 a.m., on August 16, 1991, in response to a 911 call, a Carlsbad police officer was dispatched to room 224 at the Allstar Inn, where he found Klapper lying on the bed closest to the door. [ER 2] She was not breathing and had no pulse. Firemen and paramedics soon arrived, and they administered CPR and other life saving and monitoring procedures to Klapper. [Id.] By approximately 3:20 a.m., the paramedics were able to restore some electrical activity in Klapper's heart, but not a normal beat. [ER 22] Neither the police officer nor any of the emergency personnel smelled a chemical odor in the room. Klapper was transported by ambulance to the hospital where further attempts to resuscitate her failed. She was pronounced dead at 3:52 a.m. The emergency room doctor could not determine a cause for Klapper's death. [Id.]

Several hours after her death, Klapper's body was examined by a coroner's investigator, who noticed that Klapper was missing an earring, and the lycra pants she was wearing were on inside out. [ER 4] The investigator also noticed scratches on Klapper's face including a half-moon scratch on her left cheek. [Id.] The investigator examined room 224 at the Allstar Inn, and in the trash basket found a beer can, a mixed drink carton and a styrofoam cup containing a yellowish liquid. None of the items had an odor except that of alcohol. [Id.]

Dubria talked to the Carlsbad police on three occasions during the early morning of August 16, giving essentially the same story each time. [ER 8] He explained that he and Klapper had originally planned to stay at a campsite that night, but instead arrived at the Allstar Inn at about 11:30 p.m. [ER 9] Dubria told the officers that Klapper complained of dizziness and headaches, and that she had a history of headaches. [Id.] Dubria stated that after Klapper went to sleep, she tossed and turned the whole evening. Dubria awoke at about 3 a.m. and went to the bathroom, then heard a thud, and a moan. [Id.] Dubria returned to find Klapper on the floor. She was not breathing and had no pulse. [Id.] Dubria administered CPR for about five minutes. He then panicked, and instead of calling 911 on the room phone, Dubria ran out of the room to seek help. [ER 9] The motel staff told Dubria to call 911 from his room. [ER 16] Dubria then found that he had locked himself out of the room, so he ran back to the motel office, got a key, ran back to his room a second time, and then called 911. [ER 8]

Dubria told police that he and Klapper had intercourse that night. [ER 8, 10] Dubria stated that he had drunk a beer and a mixed drink and that Klapper had several sips of the mixed drink. [ER 10] Dubria stated he did not know why Klapper had died, and that except for some brief periods when Klapper was making phone calls, he and Klapper had spent the entire day and evening together. [ER 10]

2. Dubria later testified that he had called ahead to the campground and was told that visitors were not accepted after 10:30 p.m. The State introduced evidence that although the park entrance booth closes between 10:30 and 11:00 p.m., the park remains open, and a note is placed in the entrance booth window informing latecomers which campsite has been assigned to them. Nothing in the park's recorded message tells campers that their reservations will not be honored if they arrive late. [ER 12]

Dr. Leena Jariwala, a forensic pathologist, performed the autopsy on Klapper's body. [ER 4] Dr. Jariwala found numerous pink or red abrasions and bruises on Klapper's face, including on her upper and lower right eyelids, her right chin, her left cheek, and the tip of her nose. [ER 5] Because it appeared these injuries resulted in bleeding, Dr. Jariwala concluded that they were inflicted before Klapper's heart stopped beating. [Id.] Dr. Jariwala and the emergency room physician who treated Klapper concluded that the injuries were not associated with the application of CPR, and the firemen and paramedics who aided Klapper did not believe that any of the equipment used could cause Klapper's facial injuries nor had they seen such injuries caused by the application of CPR. [Id.] An examination of swabs taken from Klapper's vagina indicated that she had had sexual intercourse relatively close to the time of death, although no vaginal injuries were detected. [Id.]

After completing the autopsy, Dr. Jariwala could find no cause of death. An examination of Klapper's brain found no abnormalities. [Id.] Toxicological tests were performed on body fluid samples taken from Klapper, but produced only one anomalous result—24 micrograms of chloroform in Klapper's blood, 7 micrograms of chloroform per gram of her liver tissue, and 17 micrograms of chloroform per milliliter of her gastric contents. [ER 6] Dr. Jariwala concluded the cause of death was chloroform intoxication. [Id.]

On October 23, 1991, detectives from the Carlsbad police department visited Dubria at his home in New Jersey. [ER 10] The officers told Dubria that they believed Dubria had accidentally murdered Klapper when he administered chloroform to her in order to rape her. Throughout the interview, Dubria denied murdering or raping Klapper. They did not arrest Dubria that day, but later charged Dubria with the rape and murder of Klapper.

One of the State's experts at trial was Dr. Lucien Morris, an anesthesiologist with extensive practical and experimental knowledge of chloroform. [ER 6] He explained that chloroform is an extremely potent anesthetic, and even when administered by experts, the use of the substance resulted in about one death per one thousand applications because the margin of error is very small. [Id.] Death can occur from the inhalation of chloroform in several ways. A lethal "relative overdose" occurs when a relatively small amount of chloroform is suddenly inhaled. The concentration of chloroform rises quickly, causing disruption of electrical activity in the heart. The amount of chloroform required to cause a relative overdose is very small. [Id.] A "frank overdose" occurs when a large amount of chloroform is inhaled causing a depression of several body systems, including the circulatory and respiratory systems, to the extent that death can result. Death can also result from chloroform inhalation when the chemical interacts in the body with other chemicals, such as adrenaline. [ER 6–7]

Dr. Morris stated that it is dangerous to administer chloroform to a sleeping person because the person could awaken and become frightened, and the resulting release of adrenaline interacting with the chloroform could be life threatening. [ER 7] He stated that if chloroform were poured on a rag and the rag were placed over someone's face, the result would be a sudden high concentration of chloroform and death could quickly occur. [Id.] Dr. Morris stated that assuming chloroform was administered to Klapper in the motel room, it was possible its smell would have dissipated before the police and emergency personnel arrived. [Id.] He added that while chloroform has a strong odor, its odor does not persist. Dr. Morris concluded that Klapper's death resulted from a relative overdose of inhaled chloroform. [Id.]

Dr. George Schwartz, a defense medical expert certified as an emergency room physician, agreed with most of the conclusions reached by the prosecution experts concerning chloroform, including that

Klapper had died from an adverse reaction to the presence of chloroform in her body. [ER 13] Schwartz concluded, however, that Klapper had ingested rather than inhaled the chloroform. Schwartz indicated that, while still unusual, chloroform's use as a recreational drug to produce giddiness was on the rise, and chloroform was both ingested and inhaled for such a purpose.[3] [*Id.*] Schwartz believed the injuries to Klapper's face were consistent with those associated with the attempts to resuscitate her. He disagreed with the prosecution's expert that because the injuries had bled they necessarily occurred before death. [*Id.*] Schwartz believed that CPR could have created enough circulation to cause bleeding in the facial scratches.

Schwartz concluded that given the electrical activity noted by the paramedics in Klapper's heart shortly after they arrived, Klapper's death must have occurred between five to thirty minutes before the paramedics' arrival. [ER 13] Schwartz also believed the smell of chloroform would persist in a closed room for eight to twelve hours and would have been smelled by emergency personnel when they arrived, but conceded that attempts at getting rid of the smell could be successful in a relatively short period of time. [ER 13–14]

Dubria testified in his own defense. He stated that before he and Klapper went to California, he had gone on seven formal dates with her. They went out for dinner, played tennis, or simply went for walks. [ER 14] Dubria had been attracted to Klapper since early in their relationship, and kissed her for the first time in April 1991. After a bowling date in May 1991, Dubria testified that he and Klapper kissed and cuddled in the back of Dubria's car. [ER 14]

Dubria's testimony regarding the events on the night of Klapper's death was consistent with his earlier statements to the investigators. With respect to how they began their physical relationship that night, Dubria stated that he gave Klapper some of his mixed drink and turned off the light. [ER 15] Klapper then signaled for Dubria to lie next to her by moving over on her bed. Dubria testified that he put his arm around Klapper and the two cuddled in the bed. They talked, kissed, and eventually had sexual intercourse. [*Id.*] Dubria added that before they had intercourse, he asked Klapper if she was using any birth control, and Klapper told him that she was taking birth control pills.[4] [ER 15–16] After intercourse, Klapper went to the bathroom, and then they went to sleep in the same bed. He then told about hearing her fall out of bed, his efforts to resuscitate her, and his calling for help. [ER 16]

The jury convicted Dubria of first degree murder, rape by use of drugs, and administering a drug in order to enable and assist himself to commit a felony. [ER 1b] The jury also found the special circumstance of rape to be true, and Dubria was sentenced to life imprisonment without the possibility of parole. [*Id.*] Dubria appealed to the California Court of Appeal, Fourth Appellate District, Division One. [ER 126] Dubria consolidated his state petition for a writ of habeas corpus with his direct appeal. [*Id.*] Both the direct appeal and habeas petition were denied by the Court of Appeal in a written, unpublished opinion on July 18, 1995. [ER 16–66] Dubria's petition for review by the California Supreme Court was denied without opinion on October 19, 1995, and

---

3. Dr. John Bushong, the emergency room physician who treated Klapper, testified that although he has access to extensive and current literature on drug use, he had never heard of chloroform as a recreational drug, and had never heard of another patient other than Klapper who had died of a chloroform overdose.

4. Klapper's gynecologist testified that he had prescribed birth control pills to Klapper to treat her complaints of menstrual spotting. Klapper's gynecologist gave her two packages of birth control pills, but at the time of her death, Klapper had not yet started taking them.

his petition for writ of certiorari to the United States Supreme Court was denied on February 20, 1996. *Dubria v. California*, 516 U.S. 1118, 116 S.Ct. 923, 133 L.Ed.2d 852 (1996).

 With his available state law remedies exhausted, Dubria filed the instant habeas petition in federal district court.[5] [ER 73] The district court, fully adopting the findings, conclusions, and recommendations of the magistrate judge, denied the petition on the merits. [ER 150] Dubria timely filed his notice of appeal and moved for a certificate of probable cause on March 10, 1998.[6] [ER 165]

## II. STANDARD OF REVIEW

 The district court's decision whether to grant or deny a petition for habeas corpus is reviewed *de novo*. *See Crotts v. Smith*, 73 F.3d 861, 864 (9th Cir.1996). State court findings of fact are given a presumption of correctness. *See* 28 U.S.C. § 2254(d); *Jeffries v. Wood*, 114 F.3d 1484, 1499–1500 (9th Cir.) (en banc), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). A federal district court's findings and its adoption of the findings of a federal magistrate judge are reviewed under the clearly erroneous standard. *See Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir.1994). A claim of ineffective assistance of counsel is a mixed question of law and fact reviewed *de novo*. *Crotts v. Smith*, 73 F.3d 861, 864 (9th Cir.1996)

5. Petitioner's habeas corpus petition was pending when the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2253 (AEDPA), was enacted. Therefore, the AEDPA does not govern our review of petitioner's petition. *See Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir.) (en banc), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997).

6. The district court erroneously concluded that the AEDPA applied to this case, and instead of issuing a certificate of probable

## III. DISCUSSION

### A. ADMISSION OF DUBRIA'S PRE-ARREST INTERVIEW

Several months prior to Dubria's arrest, detectives from the Carlsbad police department visited Dubria at his home in New Jersey, and then interviewed him at a nearby county prosecutor's office. During the interview, Detective Detar made numerous inflammatory statements in an effort to elicit information from Dubria on the circumstances surrounding Klapper's death. Detar repeatedly stated his strong belief that given the "conclusive" evidence, Detar had "no doubt" that Dubria caused Klapper's death. After Dubria denied any involvement in Klapper's death, Detar stated numerous times that no one would believe Dubria's story—the same story Dubria used as his defense at trial—because they would know it was a lie. *See* Appendix for fuller remarks of Detective Detar. At trial, the State offered the tape of the interview in its case-in-chief to show that Dubria had no explanation for the presence of chloroform in Klapper's body. None of Detar's inflammatory statements, however, was excised from the tape before it was played to the jury. Over counsel's objection, a transcript of the interview was also later given to the jury. On appeal, Dubria argues that Detar's inflammatory statements should have been redacted out of the interview before it was admitted into evidence, and that it was a violation of due process for the trial court to admit the tape and transcript of the pre-arrest interview into evidence.

cause, it issued a certificate of appealability limiting the issues that Dubria could raise. [ER 153–61] As we stated in note 5, *supra*, because Dubria filed his petition on April 12, 1996, before the April 24, 1996 effective date of the AEDPA, that statute did not apply to Dubria's appeal. Accordingly, the panel is not limited by the district court's certificate and may review all of the claims raised by Dubria. *See Chacon v. Wood*, 36 F.3d 1459, 1466–67 (9th Cir.1994); *Van Pilon v. Reed*, 799 F.2d 1332, 1335 (9th Cir.1986).

## 1. *Procedural Default*

Before reaching the merits of this issue, we first address the State's argument that Dubria procedurally defaulted on this claim by not raising a contemporaneous objection to the admission of the tape prior to its being played to the jury. The CCA declined to address the merits of this issue, holding that because counsel failed to make a specific objection to the playing of the unedited tape, the issue had been waived. It is unclear why the CCA concluded that there was not an adequate contemporaneous objection. At trial, counsel made the following objection:

> This goes on for another six or seven pages of Detective Detar's kind of self-serving speech without anything, without any reply from my client ... and I think that it's not my client's statements.

[ER 255] The CCA faulted counsel, however, for failing specifically to request that Detar's inflammatory statements be redacted.[7]

■■■ In any event, we may reach the merits of this issue notwithstanding the CCA's finding that counsel failed adequately to object. The State failed to raise the procedural bar issue before the district court in its answer to Dubria's habeas petition. Generally, "if the state fails to assert an interest in compliance with its procedural rules in the petitioner's federal habeas proceedings," the State waives the procedural default defense. *Harmon v.*

*Ryan,* 959 F.2d 1457, 1461 (9th Cir.1992). Thus, this court "will usually not allow the [State] to raise a petitioner's default for the first time on appeal, when it did not take the opportunity to do so before the district court." *United States v. Barron,* 172 F.3d 1153, 1156 (9th Cir.1999) (en banc) (citing *Turner v. Duncan,* 158 F.3d 449, 454–55 (9th Cir.1998) (as amended) and *Francis v. Rison,* 894 F.2d 353, 355 (9th Cir.1990)). "Because there are no extraordinary circumstances present in this case which would suggest that justice would be served by overlooking the government's omission," *Barron,* 172 F.3d at 1156–57, we hold that even if defense counsel's objection was not adequate, the State has waived the defense of procedural default, and we therefore reach the merits of Dubria's due process claim.[8]

## 2. *Due Process*

■■■ To show that his due process rights were violated, Dubria must demonstrate that the erroneous admission of the unedited tape and transcript of the interview "so fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991); *see also Villafuerte v. Stewart,* 111 F.3d 616, 627 (9th Cir.1997), *cert. denied,* 522 U.S. 1079, 118 S.Ct. 860, 139 L.Ed.2d 759 (1998). "Only if there are no permissible inferences the jury may draw from the evidence can its admission

---

7. Anticipating that the CCA might hold that Dubria waived this claim, Dubria also raised this issue as a claim for ineffective assistance of counsel for failing adequately to object. In addressing that claim, the CCA held that counsel was not ineffective for failing to object:

> We have reviewed the transcript of the ... interview and find it generally unremarkable. There is no doubt the officers were accusatory and suggested in a variety of ways that they did not believe [Dubria]. The jury would certainly understand this to be the police position and would give to it no more weight than they would the fact [Dubria] was charged by the prosecutor with murder or that the prosecutor clearly also disbelieved [Dubria]....

> There was nothing particularly damning in the officers' statements or suggestions of evidence or theories that the People did not present or offer at trial.

[ER 35]

8. The State argues that it failed to raise the procedural default defense because Dubria did not properly raise the due process issue in his habeas petition. A review of Dubria's habeas petition, however, refutes the State's assertion. Dubria clearly raised the due process issue in claim 3.b of his habeas petition, [ER 81] and the issue was even certified by the district court in its certificate of appealability. [ER 161]

violate due process[, and e]ven then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" *Jammal,* 926 F.2d at 920 (quoting *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1465 (9th Cir.1986)). "We are not a state supreme court of errors; we do not review questions of state evidence law." *Jammal,* 926 F.2d at 919. That the admission of the unedited tape may have violated state evidentiary rules is not sufficient grounds for habeas relief, *see Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), and our inquiry is limited to whether admission of the unedited tape and transcript of the interview rendered the trial fundamentally unfair. Still, when a state trial court's evidentiary ruling results in a denial of a habeas petitioner's due process rights, the Constitution requires us to enforce those rights by granting the petitioner's writ. *See Jammal,* 926 F.2d at 919.

On appeal, the State argues that the "permissible inference" that the jury could draw from the tape and transcript of the interview is that when Dubria was interviewed prior to his arrest, he could not explain why lethal levels of chloroform were found in Klapper's body. [Red Brief at 49] We agree with the State that *portions* of the interview were relevant for this narrow purpose. During the interview, Dubria denied any involvement in Klapper's death, and suggested that Klapper may have self-administered the chloroform, [SER 95] or that both of them may have been exposed to chloroform while driving behind a chemical truck. [SER 62] Dubria does not dispute that these portions of the interview were admissible for the State's proffered purpose. Rather, it is Detar's long narratives stating his belief that Dubria was guilty, and that no one would believe Dubria's version of events, that Dubria challenges. *See* Appendix.

 We agree with Dubria that Detar's inflammatory statements were not relevant to demonstrating that Dubria could not explain the presence of chloroform in Klapper's body, nor to any other permissible inference, and should have been redacted from the tape and transcript of the interview before it was presented to the jury. The long narratives made by Detective Detar only served to inform the jury of Detar's otherwise inadmissible opinion that he had no doubt that Dubria had caused Klapper's death, and that Dubria's version of events would not be believed by anyone, including the judge and jury. Under either federal or state law, Detar would not be able to testify to his opinion as to Dubria's guilt or innocence. *See, e.g., United States v. Espinosa,* 827 F.2d 604, 612 (9th Cir.1987) ("A witness ... may not give a direct opinion on the defendant's guilt or innocence."); *People v. Torres,* 33 Cal.App.4th 37, 39 Cal.Rptr.2d 103, 108 (1995) ("A consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant."). Such opinions are of no assistance to the jury because the jury is as competent as the witness to determine the issue of guilt. *Id.*

 The opinions of an investigating officer on the defendant's guilt are presumptively prejudicial and inadmissible, *see United States v. Harber,* 53 F.3d 236, 241 (9th Cir.1995) (reversible error where investigating officer's summary report containing the officer's personal opinions on the defendant's guilt was accidentally read and relied upon by the jury), and could convey the impression that evidence not presented to the jury, but known to the investigating officer, supports the charges against the defendant. *Cf. United States v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (allowing the jury to hear the prosecutor's personal opinion on the defendant's guilt presents danger that jury will believe other evidence supports charges); *United States v. McKoy,* 771 F.2d 1207, 1211 (9th Cir.1985) (same). Further, because the officer's testimony may carry with it the imprimatur of the State, the jury may tend to give his personal opinion added weight.

This court has previously stated that the testimony of law enforcement officers often carries " 'an aura of special reliability and trustworthiness,' " *United States v. Gutierrez,* 995 F.2d 169, 172 (9th Cir.1993) (quoting *Espinosa,* 827 F.2d at 613), and the jury could have deferred to the officer's judgment rather than relying on its own view of the evidence.[9]

 It is equally clear under California law that before the tape recording of an interrogation is played to the jury, the tape should first be edited to remove material that is either inadmissible or would unfairly prejudice the defense. *See People v. Sanders,* 75 Cal.App.3d 501, 142 Cal. Rptr. 227, 230–31 (1977). The assertion of the CCA and the State that "it would have been very difficult to edit the tape recording by excising the complained of statements without seriously harming the coherence and meaning of the interview" is belied by the transcript of the interview itself. The complained-of portions of the interview are separate from the relevant portions, and proceed more as a monologue by Detar, interrupted only by "Uh-hums" by Dubria, than a dialogue. Redacting Detar's inadmissible opinions would not have been difficult, yet would have eliminated the risk of unfair prejudice from those opinions.

It is true that the jury was twice given a cautionary instruction that Detar's questions should not be considered for their truth, but only to place Dubria's answers in context.[10] [ER 33] Still, given the extremely prejudicial nature of Detar's statements, as well as the fact that a transcript of the interview was also later given to the jury, *see United States v. Hernandez,* 27 F.3d 1403, 1408 (9th Cir.1994) (as amended) (noting the risk that juries may put undue emphasis on particular testimony if provided with transcripts); *United States v. Sacco,* 869 F.2d 499, 501 (9th Cir.1989) ("Our concern with rereading or replaying testimony is that, in addition to the delay involved, it may place undue emphasis on testimony considered a second time at such a late stage of the trial."), we cannot conclude that the instructions cured the impact of Detar's inflammatory statements on the fairness of Dubria's trial.

Although we hold that it was error to admit the unedited tape and transcript of the interview, we need not decide whether this error alone rendered Dubria's trial fundamentally unfair, because we also hold that Dubria's counsel's defective performance in failing to object to improper closing argument comments prejudiced Dubria.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

 Dubria argues that his trial counsel was ineffective for failing to object

9. The CCA stated that "[t]he jury would certainly understand [Detar's belief that Dubria was guilty] to be the police position and would give it no more weight than they would the fact that [Dubria] was charged by the prosecutor with murder or that the prosecutor clearly also disbelieved [Dubria]." The CCA's rationale, however, ignores the reasons why law enforcement officers may not testify as to their personal opinion about the defendant's guilt, not to mention that prosecutors are also not allowed to state their belief or opinion regarding the guilt of the defendant. *See United States v. Molina,* 934 F.2d 1440, 1444 (9th Cir.1991).

10. The trial court's first cautionary instruction provided: "Ladies and gentlemen, you should view these questions and answers in the same way that you view the questions and answers in the courtroom. In other words, the questions are only pertinent as they may explain what the answers themselves are. You are not to assume as true anything that Detective Detar says in his questions. The questions are only pertinent as they give you meaning to the answers." [SER 141] Immediately before playing the tape, the jury was warned again: "Again I want to caution you, too, you are not to consider any of the statements that Detective Detar makes for the truth of the matters in those statements. Those are just questions or statements in the forms—questions in the form of statements. They are not to be considered for the truth, they are only to be considered as how they may give meaning to the answers." [SER 143]

to statements made by the prosecutor during closing arguments. To establish ineffectiveness of counsel, Dubria must demonstrate that his counsel's failure to object at trial was deficient, and that the deficient performance prejudiced his defense, denying the defendant a fair trial. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner "must show that counsel's representation fell below an objective standard of reasonableness" to prove his counsel's performance was deficient. *Id.* at 688, 104 S.Ct. 2052. To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Dubria argues that his counsel should have objected to the following statement by the prosecutor, which implied that he had personal knowledge of other bad acts committed by Dubria:

> But to get up here and get on the stand and look at you people and tell you that story that he told you in front of the family, this piece of garbage, making up every bit of it, he's the biggest liar you've ever encountered. He's a lot worse than that. I'm not going to tell you. You can imagine some of the things I would tell you what he really is. I'm not going to tell, because you know. You know in your hearts what else.

[ER 321–22] The CCA called this statement harmless because it was "obscure," and did not likely have any "meaningful effect on the jury." [ER 52] The district court, while stating that this statement was more "troublesome," did not believe that the statement was so harmful that there was a reasonable probability that it would have changed the outcome, and thus

concluded that Dubria had failed to demonstrate prejudice.

1. *Reasonableness of Counsel's Performance*

This court has previously held that "[a]s a general rule a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *United States v. Molina,* 934 F.2d 1440, 1444 (9th Cir.1991). This court has also held that a prosecutor commits misconduct when denigrating the defense as a sham. *See United States v. Sanchez,* 176 F.3d 1214, 1225 (9th Cir. 1999). The prosecutor did both here, and we hold that counsel should have objected to such misconduct. The prosecutor called Dubria a "piece of garbage," and "the biggest liar you've ever encountered." We can see no tactical advantage gained by Dubria, and counsel states that he sought no such tactical advantage,[11] in failing to object to the prosecutor's plainly improper statements which impugned both Dubria and his counsel for presenting a sham defense. *See Sanchez,* 176 F.3d 1214, 1224–25 (9th Cir.1999); *see also United States v. Smith,* 962 F.2d 923, 936 (9th Cir.1992) (improper attack on defense counsel were plain error); *Bruno v. Rushen,* 721 F.2d 1193, 1195 (9th Cir.1983) (per curiam) (improper attack on the integrity of defense counsel one ground for granting of habeas petition). We hold that reasonably competent counsel should have objected.

Further, the prosecutor's statements "He's a lot worse than that. I'm not going to tell you. You can imagine some of the things I would tell you what he really is. I'm not going to tell, because you know. You know in your hearts what else," improperly suggested to the jury that the prosecutor had personal knowledge about Dubria's character and guilt. "It is well settled that a prosecutor in a

---

11. Dubria's trial counsel attached a declaration to Dubria's federal habeas petition stating that he had no tactical reasons for failing to object during the State's closing arguments. [ER 431–33]

criminal case has a special obligation to avoid improper suggestions, insinuations, and especially assertions of personal knowledge." *United States v. Edwards,* 154 F.3d 915, 921 (9th Cir.1998) (as amended) (quotations omitted). "[A]ssertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). We again can see no tactical advantage gained by Dubria in failing to object to these statements.

In sum, although we are cognizant that there may be many reasons for not interrupting closing arguments with objections, we conclude that Dubria's counsel's failure to object to closing argument fell below the objective standard of reasonable representation.

### 2. *Prejudice*

In addition to showing that his counsel's representation fell outside the range of professional competence, Dubria must also show that there is a reasonable probability that, but for his counsel's ineffective assistance, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Had defense counsel objected, it is reasonably likely that the trial court would have stricken those comments and instructed the jury to disregard them as improper. Instead, the prosecutor was allowed to call Dubria a liar and a piece of garbage, and further to suggest that other evidence not presented to the jury supported the charges against Dubria. The prejudicial impact of these statements was exacerbated by the fact that the jury earlier had heard Detective Detar's inflammatory statements that Detar had no doubt that Dubria caused Klapper's death, and that no one on the jury would believe Dubria's version of events.

■ We thus hold that Dubria's counsel's error in failing to object was deficient performance. While the prejudice from this error alone may not have altered the outcome of Dubria's trial, we hold that the cumulative impact of the prejudice from this harm, and the harm caused by the erroneous admission of Dubria's pre-arrest interview without first redacting Detar's inflammatory statements, deprived Dubria of his right to a fair trial. *See Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir.1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus...."). We thus reverse the district court's denial of Dubria's habeas petition and remand with instructions for granting the writ.

### C. SUFFICIENCY OF THE EVIDENCE

■ Although we reverse Dubria's conviction and remand for a grant of his petition, we must still reach the merits of Dubria's sufficiency of the evidence claim, because the Double Jeopardy Clause would preclude a retrial if the evidence were found to be insufficient. *See Bean v. Calderon,* 163 F.3d 1073, 1086 (9th Cir. 1998).

■ In *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court held that evidence is sufficient to support a conviction if "*any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." (emphasis in original). Further, "*all of the evidence* is to be considered in the light most favorable to the prosecution," *id.* (emphasis in original), and if the historical facts would support conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781. We may find for Dubria only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324, 99 S.Ct. 2781.

In California, a murder "committed in the perpetration of ... rape" constitutes murder in the first degree. Cal.Penal Code § 189. At the time of Dubria's state trial in 1992, the relevant portion of the California statute defined rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator ... [w]here a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, administered by or with the privity of the accused." *People v. Cortez*, 30 Cal.App.4th 143, 35 Cal.Rptr.2d 500, 502 n. 2 (1994) (quoting Cal.Penal Code § 261(a)(3)).[12] First degree murder with the special circumstance of rape is punishable either by the death penalty or life imprisonment without parole. Cal.Penal Code § 190.2(a)(17)(C). In order to prove Dubria is guilty of felony murder, the State was required to prove beyond a reasonable doubt that Dubria administered the chloroform to Klapper to render her unconscious so that he could have intercourse with her (the rape), and that she died in the perpetration of the rape (felony murder).

Dubria makes three arguments in challenging the sufficiency of the evidence: (1) the evidence was insufficient to prove that he was the source of the chloroform; (2) the evidence was insufficient to prove that Dubria used the chloroform to rape Klapper; and (3) given the time of the last sign of electrical activity of Klapper's heart, there was insufficient time for Dubria to have committed the rape.

1. *Administration of the Chloroform to Klapper* [13]

██ There was sufficient evidence to allow a reasonable jury to conclude that the chloroform found in Klapper's body was administered by Dubria and did not come from any other source. Because of the nature of Klapper's death—an acute fatal reaction to the chloroform—the only people the evidence indicated could have administered the chloroform to Klapper were Klapper and Dubria. Further, we hold that there was sufficient evidence for the jury reasonably to find that Klapper did not self-administer the chloroform.

Dubria's expert, Dr. Schwartz, testified that the use of chloroform as a recreational drug was on the rise. There was no evidence presented, however, that Klapper had ever used chloroform as a recreational drug. Reviewing the evidence in the light most favorable to the State, we agree with the California Court of Appeal ("CCA") that "the presence of chloroform by any method other than its administration by [Dubria] becomes difficult to accept." [ER 21]

Relying on *Mikes v. Borg*, 947 F.2d 353 (9th Cir.1991), Dubria argues that the fact that chloroform was found in Klapper's body is insufficient to prove that Dubria administered it to Klapper, or that Dubria used the chloroform to rape Klapper. In *Mikes*, we held that "in fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects while committing the crime in question, the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date." 947 F.2d at 356–57 (emphasis omitted). Dubria's reliance on *Mikes* is misplaced for two reasons.

---

12. Section 261(a)(3) was later amended in 1994 to define rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator ... [w]here a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." Cal.Penal Code § 261(a)(3) (1995).

13. Dubria also argues that the chloroform toxicological evidence itself is false because it may have been contaminated. This issue is addressed in the next section, but for the purposes of discussing the sufficiency of the evidence, it is assumed that Klapper died of chloroform intoxication.

First, we have repeatedly held that *Mikes* "applies only to so-called 'fingerprint-only' cases in which the prosecution's exclusive evidence of guilt is the presence of the defendant's fingerprints at the crime scene or on the murder weapon." *Bean,* 163 F.3d at 1086; *see also Taylor v. Stainer,* 31 F.3d 907, 909 (9th Cir.1994). Second, even assuming fingerprint evidence could be analogized to evidence of chloroform, the State's evidence went beyond the mere fact that chloroform was found in Klapper's body, but also included sufficient physical and circumstantial evidence that Dubria administered the chloroform to Klapper shortly before he had intercourse with her. We hold that the evidence was sufficient for a "rational trier of fact" to find that Dubria administered the chloroform to Klapper. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

### 2. *The Rape of Klapper*

There was sufficient evidence that Dubria administered the chloroform to Klapper so that he could rape her. It is undisputed that Dubria and Klapper had intercourse immediately before her death. Dubria argues, however, that the evidence was insufficient to prove that the intercourse was nonconsensual. We disagree.

There was ample testimony from Klapper's family and friends that Klapper did not have a physical relationship with Dubria, was not physically attracted to him, and did not intend to have a physical relationship with him.

Physical evidence also supported the commission of rape. The autopsy revealed that Klapper had bruises and abrasions on her face, which the CCA found supported the reasonable conclusion that "[Klapper's] face was scratched when she struggled with appellant as he placed chloroform over her mouth and nose...." [ER 24] When Klapper was found, the lycra pants that she was wearing were inside-out, which the State argued showed that the pants were put back on by Dubria mistakenly after the rape. Further, Klapper was wearing only one earring at the time of her death, which the State offered as evidence of a struggle.

Dubria spends much of his brief discounting the evidence and suggesting other explanations for the facts. While his alternative explanations are plausible, the jury obviously rejected them, and the State was not required to disprove them. As explained in *Jackson,* the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." 433 U.S. at 326, 97 S.Ct. 2720. The jury was presented with sufficient circumstantial and physical evidence that the intercourse between Dubria and Klapper was not consensual. We hold that the evidence presented by the State was sufficient for a reasonable jury to find beyond a reasonable doubt that Dubria raped Klapper.

### 3. *Time For Dubria to Commit Rape*

Finally, there was sufficient evidence that Dubria had enough time to commit the rape. At trial, medical experts testified that after a heart stops beating, there is a certain window of time after which electrical activity in the heart cannot be revived. Dubria's experts placed this window at between five and twenty minutes. [ER 260; 266] The State's expert testified that he had personally seen windows between forty and fifty minutes, although he expected Klapper's window to be more resilient than an older person's, thereby enlarging the "window." [ER 297]

When the first Carlsbad police officer arrived at 3:11 a.m., Klapper had no pulse. By 3:20 a.m., the paramedics could detect some electrical activity, but no regular heartbeat. Klapper arrived at the emergency room at 3:50 a.m., but was pronounced dead at 3:52 a.m. [ER 245] Dubria argues that even assuming a fifty-minute window, Klapper could not have gone into cardiac arrest any earlier than approximately 3:00 a.m., because the last trace of electrical

activity in Klapper's heart was detected at 3:50 a.m. Further, because the 911 call was placed at 3:07 a.m., Dubria argues that this seven minute "window" between 3:00 a.m. and 3:07 a.m. did not provide him with enough time to administer the chloroform, commit the rape, dispose of the chloroform, and be locked out of his room twice.[14]

The CCA disagreed with Dubria's interpretation of the "window" evidence:

> As we read this testimony, [Klapper's] heart had to have become asystolic, i.e., ceased to have any electrical activity, between five and fifty minutes before the paramedics first monitored her heart at approximately 3:20 a.m. Given the general lack of precision in every facet of the timing of the chemical and medical events in this case, it was not impossible for [Dubria] to have administered chloroform, raped [Klapper] and then disposed of the evidence before the arrival of the emergency personnel.

[ER 23] Although Dubria calls this a "colossal error" in misreading the trial record, we hold that such an interpretation of the window evidence is supported by the record.

The State's expert clearly stated that the "window" evidence he was testifying to was the period of time after which electrical activity could no longer be restored to an asystolic heart. [GER 144] This would make the correct reference time 3:20 a.m., meaning that under the State expert's fifty minute window, Klapper could have gone into cardiac arrest as early as 2:30 a.m. Assuming that cardiac arrest occurred during the administration of the chloroform, this would have given Dubria sufficient time to have sexual intercourse and commit the acts alleged by the State before calling 911 at 3:07 a.m. Significantly, Dubria presented this "insufficient window

of time" argument at trial, but it was rejected by the jury. Because this court must view the evidence in the light most favorable to the State, *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, we hold that there was sufficient evidence for a rational trier of fact to find that Dubria had enough time to commit the acts alleged by the State.

In sum, we hold that the district court did not err in denying Dubria's insufficient evidence claim.

## D. REMAINING CLAIMS

We have considered Dubria's remaining claims of ineffective assistance of counsel, improper admission of evidence, admission of false evidence, *Miranda* violations, instructional error, and unconstitutionality of his sentence, and hold that they are all without merit.

## IV. CONCLUSION

We therefore REVERSE the district court's denial of Dubria's habeas petition, and REMAND the case to the district court with instructions to grant the writ and authorize a new trial.

REVERSED and REMANDED with directions.

## *APPENDIX*

The following contains relevant portions of Dubria's pre-arrest interview conducted by Detective Detar:

Detar: Talked to a lot of people.

Dubria: Um-hum.

Detar: And a, *pretty much, we've determined that you are responsible for her death.*

Dubria: Hum.

Detar: Now, I think … wait a minute.

Dubria: Alright.

---

**14.** When asked at oral argument, counsel for Dubria stated that he was not advancing a claim of actual innocence. *See Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997) (en banc) (requiring the petitioner to establish that he is "probably innocent" to support a free standing claim of actual innocence), *cert. denied,* 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998).

Detar: I think, that this was probably just an accident, okay. *But there's no question ...*

Dubria: But detective ...

Detar: But listen. Wait, wait wait ... let me finish, let me finish.

Dubria: Okay.

Detar: *There's no question. The evidence is conclusive.*

Dubria: No.

Detar: *That your [sic] responsible.* Okay?

Dubria: No. [SER 51]

\* \* \* \* \* \*

Detar: Um, *I believe and there's no doubt in my mind.*

Dubria: Um-hum.

Detar: *That you caused her death.* And I don't think your [sic] a murderer or anything like that ...

Dubria: Uh.

Detar: *But a, I have no doubt that that you caused her death.* Okay?

Dubria: That's, a that's a strong um, accusation....

Detar: So what I'm asking this, you know, I'm not accusing you of anything. *I'm stating what I feel the facts are.*

Dubria: Right.

Detar: *And the facts show that your [sic] responsible for it.* Now I'm asking you if, now listen to me, this is important.

Dubria: Um-hum. [SER 53]

Throughout the remainder of the interview, Detar continued to make statements to Dubria that Detar believed Dubria was guilty, and that no one on the jury would believe Dubria's story:

Detar: [I can write down your version of the events, w]hich everyone in the world is gonna know is a lie, or I can tell them the truth about the issue. That there was a mistake, that it was an accident ... [SER 59]

\* \* \* \* \* \*

Detar: They're not gonna to believe that you have no clue as to how she died. Think about it! [SER 59]

\* \* \* \* \* \*

Detar: Sam, I want you to think about what your [sic] saying. I want you to think, you gotta get something good going for you. If you tell that story, man, there ain't nobody that's going to believe that. [SER 63]

\* \* \* \* \* \*

Detar: I realize what your story is. What I'm trying to tell you is, it's obvious to everybody that that's not the truth. [SER 65]

\* \* \* \* \* \*

Detar: [ ... ] I want you to grasp this because I do care. Okay, if you lie to us, then the jury and everybody else in the world is gonna say, he's a cold blooded murderer. Okay? Listen to me I'm not done yet [....] Either "A", that's what [sic] gonna happen, or "B" it's gonna come across like, he made a mistake. It was an accident. He didn't mean to kill her, as a matter of fact he was so distraught and upset about the fact, that he did CPR, he called the paramedics, it was a mistake, it was an accident. The jury and the judge will believe that. They're not going to believe all these lies. [SER 93]

MICHAEL DALY HAWKINS, Circuit Judge, dissenting:

I regret that I cannot join the majority opinion, especially because I find little fault with Judge Boochever's recitation of the facts or discussion of the applicable law. In fact, I found his statement of the reasons warranting a retrial so compelling that it reinforces my belief that this conviction should be allowed to stand.

It is a common interrogation tactic in criminal cases to offer the suspect an opportunity to "explain what really happened." The interrogators may not actually believe that an explanation will mitigate the suspect's responsibility and the

suspect, of course, is entirely free to decline the invitation to "explain." Here, investigators asked Dr. Samson Dubria ("Dubria") to explain why a young woman he was continuously alone with for the prior 24 hours suddenly turned up dead from chloroform intoxication.

Dubria had a perfect right to say nothing. Instead, he chose to offer an explanation of his own. Hindsight suggests that if he had explained what the evidence seems to so clearly show—that Jennifer Klapper's death was the unintended result of Dubria's attempt to have sex with someone who wanted no part of such activity with him—he might not have faced first degree murder charges and life imprisonment without possibility of parole.

But Dubria chose a different course. Rather than admit that this was a planned rape gone wrong, or even remain silent, he chose—in his initial contacts with police and emergency personnel, in his later interview with homicide detectives after the toxicology results were known, and in his trial testimony—to claim that Jennifer simply dropped dead in her sleep and that he had absolutely no idea how chloroform got in her system.

Faced with a choice between Dubria's version and the State's rape-murder theory, the jury found Dubria not believable and accepted the State's proof. For our collateral review purposes, there is an adequate basis in the record for the jury's conclusion. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Our role in habeas corpus review of a state conviction does not include considerations of proportionality. Nor, as the majority correctly notes, do we sit as a reviewer of facts. Our role is to determine whether the claims of error rise to the level of constitutional magnitude and, if they do, whether any error had a substantial prejudicial effect on Dubria's fundamental right to a fair trial. *See* 28 U.S.C. § 2254.

The state trial court admitted, over defense objections, the entirety of a pre-trial interview of Dubria in which the investigators asked some very confrontational questions, laced with assertions about whether a jury would ever believe Dubria's version of events. The trial court declined to redact the transcript of the defense-challenged portions, but did give two separate cautionary instructions to the jury that these statements should be ignored and their content not be considered as true. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1971); *United States v. Merino–Balderrama,* 146 F.3d 758, 764 (9th Cir.1998) (timely instruction cures prejudicial impact of evidence unless the evidence is highly prejudicial or the instruction clearly inadequate). There is no suggestion of any kind in the record that the jury did not understand and abide by the cautionary instructions. *See, e.g., United States v. Nguyen,* 88 F.3d 812, 817–18 (9th Cir.1996); *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.1980).

Nor did the investigators' statements amount to one witness offering an opinion on the truthfulness of another witnesses's testimony. *Cf. United States v. Sanchez,* 176 F.3d 1214, 1219 (9th Cir.1999). The investigators were basically saying to Dubria: "If you stick to your version of what happened that night, not only will no one believe you, but you run the risk that they will impute motives to you that are far worse than you may have had." Especially in light of the two cautionary instructions given to the jury, it is very hard to characterize what the investigators told Dubria as a comment upon his truthfulness as a witness.

Closing argument in Dubria's trial lasted over the course of some four days, consuming some 127 pages of transcript. The majority opinion finds fault with seven lines on one of those pages and not simply with the content of what was argued, but defense counsel's failure to object to it. This was the prosecutor's argument:

But to get up here and get on the stand and look at you people and tell you the story that he told you in front of the family, this piece of garbage, making up every little bit of it, he's the biggest liar you've ever encountered. He's worse than that. I'm not going to tell you. You can imagine some of the things I could tell you what he really is. I'm not going to tell you, because you know. You know in your hearts what else.

The opinion finds fault with that portion of the prosecutor's argument where the words "this piece of garbage" were used. Read in full context, the phrase could have just as easily have referred to Dubria's story as to Dubria himself. The failure of defense counsel to object, or the trial court to intercede, suggests that the reference was to the story and not Dubria himself.

The opinion further concludes that the last four sentences of the argument constituted a statement by the prosecutor that he had personal knowledge of the defendant's character and guilt. I disagree. Having just called Dubria a "liar," a fair reading of these sentences is that the prosecutor is sparing the jury from referring to Dubria as worse.

Because I conclude that this argument does not rise to the level of being prejudicial, I would not even reach the question whether Dubria was deprived of the effective assistance of counsel by a failure to object.

I would affirm the district court's denial of Dubria's habeas petition.