[Crim. No. 28897. Second Dist., Div. Five. Nov. 29, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIZABETH SANDERS, Defendant and Appellant.

502

## COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—Defendant Elizabeth Sanders was convicted by a jury of second degree murder and sentenced to prison.

### FACTS[1]

The factual background is this: Defendant is the mother of Rosetta Barney, who was married to but separated from the victim, Willie

---

[1]The chronology in this case may be perplexing. The victim, Willie Barney, was killed in February 1972. We gather from the superior court file that as early as March 1972, the police had information that defendant had the victim killed by "two dudes." However, it was not until January and February 1974, that the police obtained statements to the effect that Joseph Jackson and James Ware, then both minors, had been hired by defendant to kill Willie. In March 1974, all three were arrested and charged. Jackson and Ware, originally charged as minors, were tried in the superior court, convicted of second degree murder and sentenced to prison in September and October 1974, respectively. Another complaint was filed against defendant. A preliminary hearing was held in February 1975, at which Ware testified and defendant was held to answer. Defendant was released on her own recognizance at some point. Her trial did not begin until February 1976. The jury returned its verdict on March 29, 1976. Although this appeal was ready to be calendared in January 1977, we delayed reviewing this case until *People v. Gainer,* 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997] was decided.

Barney. In November 1971, Rosetta was hospitalized after being severely beaten by Willie. After Rosetta was released from the hospital, Cecil Davis moved in with Rosetta and her nine children. Willie Barney continued to bother defendant and Rosetta.

Willie was killed with a .12 gauge shotgun in February 1972. Joseph Jackson and James Ware, both probably about 16 years old at the time, committed the killing. Neither Jackson nor Ware knew Willie well. Both knew defendant and defendant's daughter Rosetta. Ware was dating defendant's granddaughter and Jackson was also friendly with the family.

The People's theory was that defendant promised to pay Jackson and Ware $100 each if they would kill Willie. Her motive, according to the prosecution, was that she was tired of Willie mistreating her daughter and afraid of Willie's threats against herself and Rosetta.

The defense, in short, was that defendant asked Ware and Jackson to talk to Willie and to ask him to leave defendant and her family alone; that defendant did not ask them to kill him or want him killed and that she did not furnish the murder weapon.

*The Evidence*

The chief witness for the prosecution was James Ware, sentenced to prison in 1974. While Ware was in the Chino Guidance Center, he contacted the arresting officers and offered to testify against defendant. Ware testified that he had been offered no benefit for his testimony and that his reason for testifying was relief "from my conscience." Ware testified twice. His initial testimony, although inculpating defendant, was not what the prosecutor expected or wanted. Ware was recalled and recanted his initial testimony. This time he testified that defendant first mentioned killing Willie on February 11, when she asked him if he knew where Joseph Jackson was and whether Ware could obtain a gun. She drove Jackson, Ware and Cecil Davis—as noted, the man who was living with defendant's daughter, Rosetta—to Willie's apartment and pointed it out to them. She said she wanted Willie "knocked off." She asked Jackson and Ware to do it for her. They agreed. She promised to pay them $100 each. Davis was present during this conversation. Jackson obtained a shotgun and defendant bought shells for it.

The next morning, defendant, Ware, and Jackson had another conversation in which Jackson said that they would wait at Rosetta's home until everyone went to sleep and then go over and "knock him off." That evening, defendant picked up Ware in her car. Jackson and Cecil Davis were also in the car. Defendant again said that she wanted Willie killed. Davis gave Jackson a handgun. They went to Rosetta's home. Defendant said that she would take them over to Willie's after everyone went to sleep. At about 12:30 a.m., Jackson got the shotgun down from the attic and put the gun in the trunk of defendant's car. Defendant drove Ware and Jackson to Willie's apartment and waited on a side street. Jackson assembled and loaded the gun. Mickey Segers saw them, but Jackson did not want to abandon the plan. He knocked on Willie's door and shot him when Willie opened the door. They then ran back to the car. Defendant asked if they had gotten Willie, and when Jackson said, "I blew his head off," defendant started laughing. They returned to Rosetta's home at about 3 a.m., and Jackson put the shotgun in the attic.

On cross-examination, Ware admitted that he had lied at his own trial, at defendant's preliminary hearing and in his earlier testimony at defendant's trial. On redirect examination, the prosecutor attempted to establish that Ware had lied because he was afraid that if he admitted the extent of his involvement in the crime, particularly carrying a handgun, he could be retried on that issue and sentenced more severely. Ware was an accomplice as a matter of law and the jury was so instructed.

Ware's testimony was partly corroborated by Cecil Davis. There was evidence that Davis had participated in the crime, and the jury was instructed accordingly. He testified that on February 12, defendant drove Jackson, Ware and himself to Willie's apartment, pointed to an upstairs apartment and said something like, "That's the place." That evening, defendant, Ware and Jackson were sitting around the kitchen table at Rosetta's home and he heard one of the two men say something about beating up Willie. The next morning—that is, after Willie was shot—defendant and Davis were driving past Willie's apartment building and defendant said, "They got him . . . the car is there." That evening, Jackson came by and took a shotgun down from the attic. What appeared to be an expended shotgun shell fell out. Jackson put the shotgun in the trunk of his car. In February 1974, Davis had told the police that defendant had told him on February 12, 1972, that she was going to kill Willie. At trial, Davis did not recall making that statement.

Ware's testimony was also corroborated in part by Mickey Segers, who testified[2] that on the evening that Willie was shot, he was standing at the corner of 84th and Avalon and asked Ware and Jackson for some cigarettes. Segers then went into his friend's apartment in the same building in which Willie lived. Segers looked out a half-open door and saw that one of the men had a shotgun and the other had a handgun. He shut the door and then heard a noise like a gunshot and the sound of footsteps.

The prosecution offered evidence of other threats by defendant. Joseph Nichols, who was dating one of Willie's daughters and was a "good friend," testified that about one year earlier, he heard defendant tell Willie that she was going to have him killed. Walter Scott testified that in October or November 1971, defendant told him that she was tired of Willie mistreating her daughter and asked Scott to kill him for $500. Scott refused. Frances Scott, Walter's wife, testified that she was present and heard the conversation.[3]

Rosetta Barney testified that in November 1971, Willie beat her severely and accidentally shot her in the hand.

Officers Reynolds and McGuine of the Los Angeles Police Department interrogated defendant on March 27, 1974, at the 77th Street station. The interrogation was tape recorded and transcribed. Over defense objection that the tape should have been edited, the entire tape was played, and a transcript was given to the jury.

During the interrogation, defendant denied that she wanted Willie killed or that she had asked anyone to kill him. She admitted that she wanted Ware and Jackson to talk to Willie and ask him to leave defendant and her family alone. She spoke to them down on 113th Street and took Jackson and Ware to show them Willie's house. Sometime earlier, Jackson and Ware had left a disassembled shotgun at Rosetta's apartment. The night that Willie was shot, they came to Rosetta's apartment to get the shotgun. Cecil Davis gave them the gun. Defendant did not believe that Ware and Jackson had taken the shotgun because they were going to kill Willie. Later that night, or early morning, Jackson

---

[2]Segers was dead by the time of defendant's trial. The jury was read his testimony at Ware's preliminary hearing in 1974.

[3]The People also called Joseph Jackson in rebuttal. He refused to answer any questions on grounds of self-incrimination.

and another boy, not Ware, brought the gun back. The gun was still disassembled. Defendant never promised to give Ware and Jackson money, and she never gave them money. Defendant did not remember sitting down at the table talking to Ware and Jackson. She never suggested what would be a good time to go over and talk to Willie.

The defense was limited to testimony by defendant's granddaughters that Ware and Jackson were not at Rosetta's house that evening, and evidence suggesting that the police had made a deal with Joseph Nichols and Walter Scott, who testified to threats made by defendant, in exchange for their testimony.

Facts will be added in the discussion.

DISCUSSION

*The Interrogation*

As noted, during the interrogation by Officer Reynolds, defendant, though denying that she wanted Willie killed or had solicited his murder, made damaging admissions evidencing her involvement. No one disputes that those admissions were properly received. Much more, however, was heard by the jury and taken into the jury room. The transcript of the interrogation covers 36 double spaced, legal size pages. It consists in substantial part of narrative statements by Officer Reynolds which embraced a multitude of facts and were not even in question form. Some are copied below.[4] ▮▮ The vice of permitting these statements

---

[4]"I know that because of the way Willie was, and the threats that he had made to you, and the harm that he had done Rosetta, that you wanted him out of the way, and that you told people that you wanted him out of the way, and that you wanted somebody to get him out of the way before he killed Rosetta or you or some of the kids, I know this. There's people that can testify that they heard you make these threats and that you talked to people about it. Not just one person but several people. . . .

"In the first place there were witnesses that night that seen the guys that did it and have identified them. That's no problem. We know that you weren't there. They identified the boys that did it.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"I talked to people that have convinced me and I'm certain will convince a jury that you had somebody, and those somebodies I believe were Jimmy Ware and Joseph Jackson, to go over to Barney's house. I am convinced that these people didn't even know him, knew him passing, knew him to see him perhaps to say hi and goodbye. There was really no reason for doing this other than perhaps a favor, other than maybe even some money.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"But then when I turned around and talked to people who were involved in conversations between you, Joseph Jackson, and Jimmy Ware, when I talked to people

to go to the jury is twofold. First, the procedure enabled the People to restate their case, largely in the form of double hearsay: Officer Reynolds' extrajudicial statements concerning information he had received from others. Second, the procedure enabled the People to rehabilitate some of their badly impeached witnesses in impermissible fashion. Granted that California is supra-liberal in permitting the rehabilitation of witnesses by prior consistent statements (Evid. Code, § 791) it still takes a witness, subject to cross-examination, to testify that such statements were made. Officer Reynolds' extrajudicial statements admitted via the tape and transcript clearly do not qualify.

The People argue that the officer's narrative statements were admissible as adoptive admissions (Evid. Code § 1221). We disagree. It is fundamentally unfair to expect point-by-point denials of long narrative statements, containing several facts as well as theories and inferences —particularly where the statements are not in question form. (See fn. 3 *ante.*)[5]

We need not decide whether that error standing alone would require reversal. A worse problem was created by the court's instruction to the jury, after the jury had deadlocked.

---

who saw, saw mind you, not heard, not self, not third person, but actually saw that shotgun, that shotgun, we're not getting by that, what you're saying, it ain't working.

". . . . . . . . . . . . . .

"And I talked to more than one person that told me that. More than one person that said, I didn't mean for them to kill him. . . . And then I formed the opinion that Mrs. Sanders, in her good intentions got herself involved in a situation that is called murder. I approached it by talking to Cecil. I talked to people who are close to you, and from conversations that I had with these people I formed the opinion that you had these people go over there. . . ."

[5]The suggestion that defendant had the opportunity and the duty, to interrupt the officer's narrative with repeated denials is particularly inappropriate on this record. We quote from that portion of the interrogation in which defendant "waived" her right to remain silent.

"Q. [Officer] REYNOLDS: Now, I have to advise you of your rights. You have the right to remain silent, you understand that.

"A. [Defendant] Yes, sir.

"Okay. You have the right to the services of an attorney prior to making any statements to me or anyone else. You understand that?

"A. (No response)

"Q. You have to speak up. So I know. Are you saying yes?

"A. I was just . . . (unintelligible).

"Q. No, you say yes to that. Do you understand that.

"A. *Oh, oh, I thought you said be silent.*"

*Jury Instruction*

The jury began deliberations on Wednesday, March 24, 1976, at about 11 a.m., and deliberated that day until 4 p.m. The jury deliberated from 9 to about 4 on Thursday, and from about 9 to noon on Friday.

The jury foreman indicated that there was a problem. He guessed "the only way to define it [the problem] would be an interpretation of the evidence, of the witnesses." The court said that it did not "think that there is a reason that any other jury could determine the matter any better than this jury. These decisions aren't easy."

When the foreman said that he did not think "any other jury would give it any greater degree of consideration than we could," the court replied that it was sure that that was true, but "that is what it is all about, putting it in colloquial terms, is making decisions."

At the suggestion of defense counsel, the court asked the jury how many ballots had been taken, and the breakdown of the vote. The foreman stated that nine ballots had been taken, and that the last six had been identical: nine to three.

At about 2 p.m., on Friday, the court asked the jury foreman whether further deliberation that afternoon would be of any benefit. The foreman answered no. The court then instructed the jury:

"Ladies and gentlemen of the jury, in a large proportion of the cases, and perhaps strictly speaking in all cases, absolute certainty cannot be obtained or expected. Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring twelve minds to unanimous result you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other.

"You should consider *the case must at some time be decided,* that you are selected in the same manner and from the same source from which any future jury must be selected and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this

view it is your duty to decide the case if you can conscientiously do so." (Italics added.)

The jury then deliberated for about another hour. The jury submitted to the court a question seeking "further clarification on the word intent, and also involvement, and if in any way, the two words are tied together in any way, in commission of this crime." The foreman elaborated: "A few of our number are having difficulty determining in their own mind if legally there is a difference between intent and involvement in a commission of the crime and would desire some further amplification of it."

The court advised the jury as follows: "The question between intent and involvement is your decision. And you are the jurors and are the trier of fact and have to make that decision between the two. If you are having problems with intent and involvement, why, evidence has been presented and it is a decision that you must decide. And it is your decision, there is simply not much more I can say on that."

The foreman stated that there "seems to be a feeling that if we have an opportunity to complete listening to the tape another time, that possibly something can resolve." The court then recessed deliberations until Monday on the foreman's representation that the wife of one of the jurors was in the hospital and he wanted to visit her.

On Monday, March 29, the jury began deliberations at 9 a.m. At 2:15 p.m., the jury returned with a verdict of guilty of second degree murder.[6]

In *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997], our Supreme Court reviewed the propriety of the so-called *Allen* charge and held that an instruction which urges minority jurors to consider their position is improper (19 Cal.3d at p. 851), and that the giving of such an instruction constitutes reversible error. (*Id.,* at p. 855.)

The court then reviewed that portion of the charge given in *Gainer,* which was very similar to the instruction given in this case: " 'You should consider that the case must at some time be decided, that you are

---

[6]In support of defendant's motion for a new trial, her attorney included the declaration of two jurors to the effect that they were not convinced beyond a reasonable doubt as to defendant's guilt, but that after the court instructed the jury to the effect that no other jury would be able to do "the same job we had done," the jurors were induced to vote for the defendant's guilt. We need not discuss the admissibility of these affidavits.

selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And, with this view, it is your duty to decide the case, if you can conscientiously do so.' " (*Id.,* at p. 841.)

The court held that this language was objectionable because the statement is legally inaccurate: "It is simply not true that a criminal case 'must at some time be decided.' " (*Id.,* at p. 852.) The court, however, did not hold that the giving of an instruction that "the case must at some time be decided" would necessarily require reversal. Reviewing courts were instructed to determine whether under "all the circumstances under which the charge was given" it was reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*Id.,* at p. 855.) The court pointed out that the instruction was more likely to constitute reversible error where the instruction was "the central feature of instructions given to a deadlocked jury, . . ." (*Id.,* at p. 856, fn. 20.)

We conclude that, under all the circumstances, the instruction that the case "must at some time be decided" was prejudicially erroneous.[7]

First, the instruction was given after the jury had deliberated several days, had taken nine ballots, was divided nine to three on the last six, and, according to the foreman, believed that additional deliberations would be of no benefit.

Second, the jury's problem concerning the difference between "intent and involvement" went to the heart of this case. Involvement had been

[7]When the jury returned to the courtroom after deliberating for a day and a half the court announced that it was "going to tell them there is absolutely no reason any other decision would be reached by any other people. If there is anything wrong with that, I'd like to have an understanding about that." Defense counsel suggested that the court should first find out whether the problem was an inability to arrive at a verdict and that the court might then instruct them that it did not "believe that any other jurors, if ever selected in this case would do any different." The People now argue that thereby the defense invited the error. We disagree. First: The charge, condemned in *Gainer,* is that "the case must at some time be decided," with its "attendant implication that a mistrial will inevitably result in a retrial. . . ." (*Id.,* p. 851) not the flattering prediction that the next jury will be no better than the present one. Second: The initial suggestion came from the court, which invited comment. In the light of the authorities disapproved in

admitted during the interrogation. Yet, this difficulty was not really resolved either by the instructions as originally given, or by the court's later comments.[8]

Third, and very important, the same day that the jury received the improper instruction, the foreman said that "when you called us back in we were listening to the tape. And there seems to be a feeling that if we have an opportunity to complete listening to the tape another time that possibly something can resolve." Thus, not only was the jury permitted to read and listen to the inadmissible narrative of the police officer, but for whatever reasons, the jury placed great importance on that tape.

Fourth, the jury reached a verdict less than a day after receiving the erroneous instruction and, presumably, completing the replay of the tape.

Finally,—and recognizing that *Gainer* enjoins us not to give undue emphasis to the "weight of the evidence presented to the jury before the impasse" (*id.,* at p. 856)—this was no open-and-shut case. The prosecution's important witnesses were badly impeached. James Ware, as noted, needed a second opportunity on the witness stand to tell a story consistent with what the prosecution believed his testimony would be. He admitted to having lied earlier in the trial, at defendant's preliminary hearing, and at his own trial. The testimony of Cecil Davis was suspect; he was, as noted, possibly an accomplice. Joseph Nichols, who testified that defendant said that she was going to have Willie killed, was dating Willie's daughter and was his friend. There was, in addition, defense testimony suggesting that the police helped Walter Scott and Joe Nichols in exchange for their testimony.

In conclusion, we conclude that under all the circumstances, the special instruction, when coupled with the erroneous admission of the unedited tape, was prejudicially erroneous.

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.

A petition for a rehearing was denied December 19, 1977, and the opinion was modified to read as printed above.

---

*Gainer,* counsel's remark was no more than a recognition of existing law. (Cf., *People* v. *Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17].)

[8] The jury was instructed on the definition of "Principals" (CALJIC No. 3.00) and "Aiding and Abetting" (CALJIC No. 3.01) but was not instructed that neither knowledge of a crime nor a failure to prevent that crime was culpable. (E.g., see Witkin, Cal. Crimes (1975 supp.) pp. 53-54.)