Filed 8/5/13  P. v. Kim CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>YOUNG WOO KIM,<br><br>　　　Defendant and Appellant. | B240492<br><br>(Los Angeles County<br>Super. Ct. No. KA095612) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Flier and Flier, Theodore S. Flier, and Andrew Reed Flier for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Young Woo Kim appeals from the judgment entered following his conviction by jury of conspiracy to commit first degree burglary and two counts of first degree robbery, with the finding that he voluntarily acted in concert with two or more persons in the commission of the robberies. (Pen. Code, §§ 182, subd. (a)(1), 211, 214, subd. (a)(1)(A).)[1] Defendant was found not guilty of first degree burglary and assault with a stun gun or taser.[2] (§§ 459, 244.5, subd. (b).) He contends: (1) tapes of an accomplice's interviews with police were improperly admitted; (2) his statement to police should have been excluded because he was not properly advised of his *Miranda* rights;[3] (3) the convictions are unsupported by the evidence; (4) the testimony of an accomplice was not sufficiently corroborated; (5) the court erred by refusing to disclose the jurors' contact information; and (6) the court improperly imposed the upper term sentence for the robbery conviction. Finding no error, we affirm the judgment.

## STATEMENT OF FACTS

On November 2, 2010, at approximately 8:00 p.m., Yoon Chan Han and his wife, Wan Chong Han, returned to their home in Walnut from the golf shop they own in Los Angeles. Ms. Han went upstairs. Mr. Han went out to the patio in the backyard to smoke. He was immediately approached by two masked individuals, who pushed him into the house. The men hit and kicked Han. They also utilized a taser or stun gun on him. Han fell near the living room sofa and his hands were tied behind his back. The men went around the home closing the drapes.

Ms. Han heard her husband yelling. She was about to go downstairs when a man confronted her. He tied her hands. She was told, in Korean, to lie on a chair and a

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    Defendant was jointly tried with Kyung Choi. Choi is not a party to this appeal.

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

blanket was thrown over her. The man asked, "Lady, where's the money?" She did not respond. Later, a second man lifted the blanket and told her that she would not be hurt.

Downstairs, the other assailant began searching the kitchen. This man returned and asked Han, in Korean, "Where's the money?" The second man came back downstairs. They continued to ask for money and Han responded that he had none. At one point, one of the attackers spoke to someone on the phone. As he talked, the man walked up and down the stairs. The Hans heard the caller tell someone named Jason that they had looked through the house and there was no money. The man who placed the call seemed to be getting angry. After that conversation, the intruders continued to search the home.

Mr. Han heard noise coming from upstairs. Ms. Han had jumped off the second floor balcony. One of the men went upstairs and ran back down. He told his cohort that they had to get out of the house quickly. The two men left. Han was able to untie his hands and call for help.

Ms. Han went to her neighbor's house and told him to call the police quickly because there were robbers in her house. After the police arrived at the Hans' residence, Mr. Han walked through and saw that the place had been ransacked. The Hans lost a gold necklace, Ms. Han's Rolex watch, a ring, a wallet, a cell phone and cell phone batteries.

In January 2011, Charles Ro, a special agent with the Federal Bureau of Investigation, was working undercover. On January 14, he had a conversation with a James Han (no relation of the victims). As a result of that conversation, Ro spoke with a detective from the Los Angeles County Sheriff's Department and inquired about a home invasion robbery committed in November 2010. He was provided a report of the Han robbery.

On January 21, 2011, in a nightclub in Las Vegas, Ro spoke to defendant and codefendant Kyung Choi. Defendant and Choi referred to the home invasion robbery of the Hans. Choi said he provided the address for the location of the robbery. Defendant said he knew that the victims owned a golf shop. Choi stated he paid an employee of the

shop for information regarding the owners' home, including the fact that large sums of money were kept at the location.  Choi said the robbery was unsuccessful because the perpetrators could not find the money; however, they took other valuables, including a Rolex watch.  Choi told Ro that James Han, Rene, and someone named Tubo carried out the robbery.  During the conversation, defendant confirmed he knew the address of the home where the robbery was committed and that the information regarding the home was received from an employee of the victims' golf shop.  At no time did defendant or Choi claim he was not involved in the robbery.

Los Angeles County Sheriff's Sergeant Steve Kim was an investigator assigned to the Hans' robbery.  In January, Detective Thomas Yu received information from Special Agent Ro, which caused Kim and Yu to interview three individuals in Las Vegas regarding the robbery.  They spoke to James Han, Rene Hypolite, and David Chon, also known as Tubo.

After the interviews, Sergeant Kim and Detective Yu returned to Los Angeles County and on January 25, 2011, they conducted a probation search at the home of Andrew Kim.  Detective Yu questioned Kim at the residence and again at the police station after Kim was arrested.  Both interviews were recorded and the recordings were played for the jury.

Kim, who was originally a defendant in this case, testified pursuant to an agreement that he and his attorney signed, which stated that Kim would testify truthfully against anyone involved in the home invasion robbery committed on November 2, 2010. In exchange, he would plead guilty to conspiring to commit first degree burglary and would be placed on five years of felony probation.  The agreement was to be performed after Kim completed his testimony against all participants in the robbery.

In his testimony, Kim confirmed he told Detective Yu that he knew James Han, Rene Hypolite, David Chon, who went by the name of Tobu,[4] and codefendant Choi. Kim met defendant through Choi in approximately August or September of 2010.

Sometime in September or October of 2010, Han came up with the idea of committing a robbery. Kim, Han, Choi, and defendant met and discussed the possibility of carrying out the crime. At the first meeting, both Choi and defendant said they did not want to be part of any robbery. The group continued to talk about Han's idea, with most of the meetings taking place in a Carl's Jr. lot on 6th Street and Virgil. The group would talk in either Choi's Mercedes or defendant's white Nissan. Eventually, Choi and defendant decided they would participate. They told Han they had a victim in mind. Defendant said he received information that the potential victim had a lot of money in his house. He and Choi said they knew where this person worked. They were going to follow him home, check the house out, and get back to the group.

A few days later, defendant, Kim, and Han met. Defendant handed Han a piece of paper, which Han placed in his pocket. Kim did not see what was written on the paper; however, he assumed defendant gave Han the address of the home that was targeted. Several days passed. Approximately a week before the November 2 robbery, Kim drove Han to a house in Diamond Bar at Han's direction.[5] Han told Kim to remember the house and threw the piece of paper he had received from defendant out of the car window.

Planning for the robbery continued. Han asked Kim to drive the men who were going to carry out the crime to the robbery site. Kim met those participants, who included David Chon, Alex Choi, and Rene Hypolite. At a meeting, Han introduced Chon to defendant and codefendant Kyung Choi and the men agreed to commit the

---

[4]     Chon was referred to by various witnesses as Tubo, Tobu, or Tofu. Special Agent Ro said that the word tubo in Korean means tofu or soybean. Andrew Kim stated that the word tobu meant tofu.

[5]     Although the victims' home is in the City of Walnut, there is no dispute that Kim was speaking of the home where the robbery occurred.

robbery together. Kim understood that defendant, Kyung Choi, and Han were going to act as lookouts while the robbery was taking place. Defendant and Choi asked Han when he wanted to do the crime. Han said in a couple of days. Defendant told Han that he wanted to know the day of the robbery in advance because on the day the crime was to be committed, he wanted to conduct surveillance to make certain the victims left the house and arrived at their place of work.

On the day before the robbery, defendant, Kyung Choi, Han, and Kim met at the Carl's Jr. parking lot. They agreed to meet there the next morning at 10:00 a.m. Choi told Han to take Choi's Mercedes.

The next day, November 2, Kim drove to Han's house. Kim and Han then drove to the Carl's Jr. lot in the Mercedes. There, they met Chon and Hypolite, who arrived on foot. Shortly thereafter, defendant and Choi showed up at the parking lot in defendant's Nissan. Defendant, Choi, and Han then left in defendant's car. Kim drove the Mercedes with Chon and Hypolite to pick up Alex Choi at Choi's home. After collecting Choi, Kim and the three men drove to the victims' house.

After Kim and the group arrived in the area of the targeted home, Kim drove around the block a couple of times. He stopped two blocks away and Chon, Hypolite, and Alex Choi got out of the car. After five or 10 minutes, they came back to the car, saying they could not get into the house. Kim drove the car around the neighborhood and after a few minutes he stopped and the three men got out. Again, they returned. This time, they said that one of the neighbors was outside of his house. It was around noon. Kim drove to a nearby McDonald's, where he called Han and told him that twice the men had tried unsuccessfully to gain entry into the victims' house. Han said to wait there.

After an hour, defendant, Han, and Kyung Choi arrived at the McDonald's lot. Kim spoke to the three men and explained that his group could not get into the house because there was a neighbor outside. Kim said he wanted to drive back to Los Angeles. They said that was fine.

Kim drove Chon, Hypolite, and Alex Choi to Han's house. After staying at Han's house for several hours, Kim received a phone call from his mother. Driving his car,

6

Kim left to have dinner with his family. Kim and Han continued to communicate that evening via cell phone.

Sometime after 8:00 p.m., Han sent Kim a text message, stating that they got into the house. Kim was picked up by a friend and driven to a parking lot across the street from Carl's Jr. Defendant, Kyung Choi, and Han were waiting in the lot. Defendant said because the perpetrators of the robbery, Chon, Hypolite, and Alex Choi, discovered that Ms. Han had escaped, they left the house. Han said nothing was found in the victims' house except jewelry. Han had a lady's watch and a couple of bracelets in his hands. He tried to give them to defendant. Defendant told him to keep the jewelry because it was not worth much money. Defendant took the small pouch that Han used to carry the jewelry.

Kim did not know how much money was supposed to be inside the victims' house. He understood that half of the proceeds were to be split among defendant, Kyung Choi, and Han. The remainder was to be shared by Kim, Chon, Hypolite, and Alex Choi.

On January 25, 2011, prior to Kim's arrest, defendant called and told Kim to meet him at the Grove. When Kim arrived, defendant and Kyung Choi asked whether he had heard that Han and the others had been arrested in Las Vegas. Defendant and Choi wanted to determine if Kim knew whether the men had been released. Kim said he did not know.

After the second January 25 interview at the police station, Kim bailed out of custody. He assisted authorities in the arrest of defendant, which occurred on January 26. At the time of his arrest, defendant was driving a white Nissan.

On January 26, 2011, Sergeant Steve Kim interviewed defendant. The parties spoke Korean. After being advised of his constitutional rights, defendant was asked whether he had a relationship with Kyung Choi. He responded that he and Choi had been friends for about five years. Kim asked defendant what he knew about the November home invasion robbery of the Hans. Defendant said he had attended several meetings that included Choi and someone named James and Choi and James discussed how they were going to carry out the robbery. The meetings took place inside Choi's Mercedes

Benz that was parked in a Carl's Jr. lot near 6th and Virgil in Los Angeles. On one occasion, James asked Choi if he knew of a location where money could be obtained. Choi wrote down an address and handed it to James. According to Choi, the manager of a golf shop told him that the owners had $500,000 stashed in their house. At one meeting, two individuals named Tofu and Rene attended. James explained that they were going to carry out the robbery. Defendant denied being involved.

After the robbery took place, defendant, Choi, Han, Tofu, and Rene met in the Carl's Jr. parking lot. Han handed Choi a woman's Rolex watch and a couple of rings that were taken during the robbery. Han said Tofu and Rene were unable to find any money in the home. Defendant denied taking any of the jewelry; however, he acknowledged he took possession of the bag that held the jewelry, which he later discarded.

Defendant repeatedly stated that he did not participate in the robbery and did not receive a share of the proceeds. He said he was merely a spectator to the planning of the crime and the meeting after it occurred.

DNA taken from a ski mask that was found outside the Hans' home matched the DNA profile of Rene Hypolite. The criminalist received DNA samples of other individuals, including James Han and David Chon. Neither defendant's nor Kyung Choi's sample was among those received. There were no other DNA matches.

**DISCUSSION**

I.    **The Court Properly Admitted the Tapes of Kim's Interviews With Police**

At trial, defendant objected to the admission of the tapes of Andrew Kim's two interviews by Detective Yu, claiming the interviews contained inadmissible opinion and hearsay. Specifically, he complained the detective told Kim about "information that [he had] received already from other co-conspirators[] that is completely inadmissible evidence with respect to this case." The trial court read the transcripts of the interviews and overruled the objection. Before playing the tape of the first interview conducted at

8

Andrew Kim's home, the court gave the jury a limiting instruction. In addition to explaining to the jury how it was to utilize the transcript, the court said: "A couple of other things: This will be a question-and-answer situation. The questions are not evidence. The questions are allowed only to help you understand the context of the answer. During a questioning of this nature, the investigating officers are allowed to mislead the individual being questioned. They are allowed to actually lie to them. 'We know this' or 'we don't know that' or 'what did you do here' or 'we know about this,' 'that' or 'the other thing' to see what the answer will be. Therefore, you don't take as evidence the questions themselves. They are allowed to — for you to get a sense of the context in what the answer means. You have to know what the question was to understand what a 'Yes' is. What does it mean? Or a 'No.' What does it mean?" The court gave a similar instruction before the second tape was played.

In addition, at defendant's request, the court read CALJIC No. 2.09 to the jury, which states: "Certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] Do not consider this evidence for any purpose except the limited purpose for which it was admitted."

Defendant argues that "by virtue of [the] tapes, Detective Yu was able to 'testify' without even being cross-examined. Further, a significant amount of evidence came in through the tapes and transcripts that clearly was inadmissible, extremely prejudicial, and should not have been allowed to be introduced to [defendant's] jury." He then sets forth a number of questions that were asked during Kim's interview in support of his claim. We are not persuaded.

The predicate to defendant's contention is that the information contained in Detective Yu's questions constituted evidence. It did not. Indeed, the jurors were explicitly instructed on two occasions that the questions merely supplied meaning to the answers and were not evidence. "It is axiomatic that '[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the

9

court's instructions. [Citation.]' [Citation.]" (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502.)

More importantly, the detective's questions did not give the jury information that was not testified to by other witnesses. Defendant claims that the questions allowed the admission of a "plethora of extremely prejudicial evidence," however, he fails to provide any analysis in support of his assertion. At best, there were a few occasions when Detective Yu suggested that he was privy to certain information in an effort to prod Kim into answering questions. For example, he told Kim that he had tracked James Han's cell phone and that "they" had told Yu about other robberies. Defendant fails to cite any instance where the information the detective allegedly divulged during the interview independently connected defendant to the robbery.

Defendant relies on two cases, *People v. Sanders* (1977) 75 Cal.App.3d 501 (*Sanders*) and *People v. Sundlee* (1977) 70 Cal.App.3d 477 (*Sundlee*) in support of his contention that the conviction must be reversed. Each case is readily distinguishable.

In *Sanders*, an officer interviewed the defendant with respect to a murder. She was alleged to have hired the killers. A transcript of the interview was made and was received by the jury. The panel noted that "[t]he transcript of the interrogation covers 36 double spaced, legal size pages. It consists in substantial part of narrative statements by Officer Reynolds which embraced a multitude of facts and were not even in question form." (*Sanders*, *supra*, 75 Cal.App.3d at p. 507.) For example, the officer told the defendant he had spoken to unnamed individuals who said they heard the defendant say she wanted the victim "'out of the way.'" (*Id.* at p. 507, fn. 4.) Others told the officer they were able to identify the killers and overheard conversations between the killers and the defendant during which the witnesses saw the murder weapon. The officer went on to inform the defendant that he had spoken to people "'who are close to you, and from conversations that I had with these people I formed the opinion that you had [the killers] go over there.'" (*Ibid.*) The court concluded: "The vice of permitting these statements to go to the jury is twofold. First, the procedure enabled the People to restate their case, largely in the form of double hearsay: Officer Reynolds' extrajudicial statements

10

concerning information he had received from others.  Second, the procedure enabled the People to rehabilitate some of their badly impeached witnesses in impermissible fashion." (*Id.* at pp. 507-508.)

As we have noted, in the present case, Detective Yu did not claim to have been provided information from other sources that implicated defendant in the crime.  Thus, he did not restate the prosecution case in any way.  Moreover, Detective Yu conducted his interview in a question and answer format.  An examination of the detective's interview illustrates that he did not, like the officer in *Sanders*, launch into a narrative that took up a substantial part of the interview and laid out the prosecution's case against defendant. Also, unlike in *Sanders,* the court instructed the jury not to consider the detective's questions to be evidence.

In *Sundlee*, the defendant was suspected of setting a number of fires.  Employees of the State Division of Forestry conducted surveillance of the defendant.  As the team watched, they saw a truck come into the area.  The driver got out and soon thereafter a shed burst into flames.  The team was equipped with walkie-talkies and their communications were recorded.  Included in the communications were descriptions of the suspect's movements and declarations that the defendant was identified as the suspect. (*Sundlee*, *supra*, 70 Cal.App.3d at pp. 481-482.)  All of the members of the surveillance team did not testify.  Instead, the prosecution was allowed to admit the tape without objection.  The appellate court determined the tape contained damaging inadmissible hearsay and that the defendant's counsel's failure to object to its admission constituted ineffective assistance.  (*Id.* at pp. 482-485.)

It is clear that the facts of this case and *Sundlee* are not at all similar.  *Sundlee* provides a textbook example of  inadmissible hearsay.  Out-of-court declarants were allowed to identify the defendant as the perpetrator of the arson in question.  As discussed, Detective Yu did not provide any information during the interviews that independently tied defendant to the robbery.  All of the evidence establishing defendant's guilt was provided by in-court witnesses who were subject to cross-examination.

The tapes of Detective Yu's interviews of Andrew Kim were properly admitted.

11

## II.     Defendant's Statement to Sergeant Kim Was Properly Admitted

Defendant contends his statement to Sergeant Kim should have been excluded because Kim failed to properly advise him of his *Miranda* rights.  He argues that because the sergeant was unable to state from memory the rights he explained to defendant, the prosecution failed to establish the required warnings were given.  The Attorney General claims defendant forfeited the contention by failing to raise it in the trial court and that, in any event, defendant was properly advised of his rights.  We first address the forfeiture issue.

The Attorney General correctly notes that during the hearing on defendant's motion to suppress his statement, defense counsel's sole argument was that Sergeant Kim failed to advise defendant, a foreign national, of his right to communicate with an official of the Korean consulate, as required by section 834c.  However, in his written suppression motion, counsel claimed defendant was not given proper *Miranda* warnings.  As such, we cannot conclude that defendant is raising the contention for the first time on appeal.  The fact that counsel did not emphasize the argument during the hearing means only that he chose to submit that issue on his written points and authorities.  We turn to whether defendant was properly advised of his *Miranda* rights.

At the Evidence Code section 402 hearing, Sergeant Kim testified that he advised defendant of his *Miranda* rights from a card, however, he did not have the card with him in court.  The testimony elicited was as follows.

"Q.     And do you remember the admonitions that you gave on January 26th, 2011?

"A.     Yes.

"Q.     What were they?

"A.     Um, verbatim?

"Q.     Please.

"A.     You have a right to remain silent.  And do you understand?  And then waited for a response.  You have the right to speak to an attorney before we talk to you.

Do you understand?  If you cannot afford to hire a lawyer, one will be appointed to you free of charge.  Do you understand?  And there's one more, I can't remember.

"Q.     Now — "

At that point, the court interjected, "Something about:  Anything you say can be used against you?"  To which Sergeant Kim answered, "That's correct.  I am sorry.  And after that, um, admonition I asked him if he understood and he said."  The court asked, "He said 'Yes' to all of them?"  Kim replied, "Yes."

*Miranda* requires that a suspect be warned prior to any questioning "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda*, *supra*, 384 U.S. at p. 479.)

Defendant suggests the record does not support the trial court's conclusion that he was appropriately advised of all of his rights under *Miranda* because Sergeant Kim did not immediately remember that he advised defendant that anything he said could be used against him. We disagree.

The question of whether defendant was advised of his *Miranda* rights came down to a credibility call.  Was Sergeant Kim truthful when he said he advised defendant of all four rights required by the *Miranda* decision?  The trial court clearly had to have believed the sergeant when it concluded that defendant's *Miranda* rights had "been adequately given."  Because we find the trial court's resolution of the facts is supported by substantial evidence, we must accept its evaluation of Sergeant Kim's credibility. (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)

## III.     The Jury's Guilty Verdicts Are Supported by the Evidence

As noted, defendant was convicted of conspiracy to commit first degree burglary and two counts of first degree robbery.  He contends the evidence was insufficient to sustain those verdicts.  He asserts the prosecution did not demonstrate that he was an

13

active participant in the plan to break into the Hans' residence and there was no scientific evidence tying him to the robberies.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossibly or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

Despite defendant's argument that the prosecution failed to present scientific evidence tying him to the crime or its proceeds, the testimony of Andrew Kim alone was sufficient to support the verdicts. He stated that defendant assisted Kyung Choi and James Han in concocting a plan to break into the victims' home. Through an employee of the victims' golf shop, defendant learned that they kept large sums of cash in their house. Defendant provided Han with the address to the victims' residence. Defendant was aware the robbery was going to be committed, he knew who was going to carry out the crime and was a willing participant. He also had a direct hand in the commission of the crime, as he was to act as a lookout while the others went into the victims' home. Finally, after the robbery, he met with the other participants to distribute the proceeds of the crime. Those facts, if believed, were sufficient to establish that defendant conspired to commit a burglary and participated in the robberies.

Defendant alleges that Kim is a self-admitted liar and testified to whatever the prosecution wanted him to in an attempt to garner a lenient sentence. He describes Kim's testimony as "incredulous and unbelievable." However, it was for the jury to determine whether Kim was credible when he said defendant was a participant from beginning to

14

end in the crimes of which he was convicted. As Kim did not describe events that are physically impossible or inherently improbable, his testimony was sufficient to support defendant's convictions.

Defendant also argues the evidence was insufficient because the verdicts were inconsistent. Defendant was convicted of conspiracy to commit burglary and two robberies, while the codefendant was convicted of conspiracy and burglary, but not the robberies.[6] He failed to cite any authority for his assertion that inconsistent verdicts necessarily mean that a conviction is not supported by the evidence. In the absence of such authority, we may deem the contention forfeited. (See *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826-827, fn. 1.)

In any event, defendant's claim fails on the merits. He and the codefendant had their cases heard by different juries. "Occasional inconsistent jury verdicts are inevitable in our criminal justice system. If a verdict regarding one participant in alleged criminal conduct is inconsistent with other verdicts, all of the verdicts may stand. [Citations.]" (*People v. Superior Court* (*Sparks*) (2010) 48 Cal.4th 1, 5.)


## IV.    Kim's Testimony Was Sufficiently Corroborated by Other Evidence

Defendant urges, "there was insufficient evidence to corroborate the co-conspirator testimony of Andrew Kim." He incorrectly assumes his statement to Sergeant Kim cannot be considered because of the alleged *Miranda* violation and argues the only remaining evidence that might corroborate Kim's testimony came from Special Agent Ro. Upon examining all of the evidence presented at trial, we conclude Kim's testimony was sufficiently corroborated.

Section 1111 provides in pertinent part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." "The evidence, however, need not corroborate every fact to which the accomplice testifies. [Citations.]

---

[6]    Defendant mistakenly stated he was convicted of conspiracy to commit robbery.

15

'"Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" . . . The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' [Citation.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 55.)

Defendant's statement to Sergeant Kim provided substantial corroboration for Andrew Kim's testimony. Consistent with Kim's testimony, defendant admitted: (1) he attended several meetings during which codefendant Choi and "James" discussed how they were going to carry out the robbery; (2) the meetings took place inside Choi's Mercedes Benz that was parked in a Carl's Jr. parking lot near 6th and Virgil; (3) Choi learned from the manager of the victims' golf shop that they had a substantial amount of cash stashed in their house; (4) Tofu (David Chon) and Rene carried out the robbery; (5) after the robbery, he met with Choi, James, Tofu, and Rene in the Carl's Jr. parking lot; (6) James handed Choi a woman's Rolex watch and other jewelry; (7) James said Tofu and Rene were unable to find any money in the house; and (8) he took possession of the jewelry pouch.

Special Agent Ro's testimony corroborated Kim's statement that defendant was a willing participant in the crimes and not a mere bystander, as defendant claimed. During Ro's meeting with defendant and Choi in Las Vegas, defendant referred to the robbery of the Hans. Defendant said he knew: (1) the victims owned a golf shop; (2) an employee of the shop provided information that the victims kept large sums of money in their home; and (3) the address of the victims' home. He was also present when Choi provided Ro with specific details of the robbery, including the names of the perpetrators and the fact that they could not find the money and took other valuables, including a Rolex watch. Significantly, at no time did defendant claim he was not involved in the robbery.

As the evidence from witnesses other than Kim tended to connect defendant with the crime, the requirement of section 1111 that an accomplice's testimony be corroborated was satisfied.

**V.**     **The Court Properly Denied Defendant's Request for Jurors' Contact Information**

Following the verdict, defendant filed a motion to release the jurors' contact information.  The motion was supported by declarations from defendant's attorney and codefendant's attorney.  Defendant's counsel declared that as the verdict was being read, one of the juror's looked at him and whispered, "I am sorry."  Counsel went on to relay his understanding of a conversation codefendant's counsel had with an alternate juror. He also cited the fact that initially the verdict forms for counts 4 and 6 stated defendant was guilty and some of the jurors spoke up and said that was an error.

Codefendant's counsel's declaration stated:  (1) he spoke to the foreperson of defendant's jury, who said that the jury did not want the responsibility of finding defendant not guilty, as he could appeal; the foreperson also expressed his personal dislike for defendant's counsel; (2) a second unidentified juror told him she was sorry for what happened and stated there were two members of the jury who did not understand English and could not follow what occurred during the trial; and (3) the alternate juror told him the juror who eventually became the foreperson expressed his determination from the first day of trial that defendant be found guilty and there were two jurors who did not understand English or why they were on a jury.

Later, defendant filed a report from an investigator, who stated he interviewed an alternate juror in defendant's trial.  The report included an unsworn, unsigned statement from the juror, which said:  (1) two jurors expressed opinions outside of the courtroom that they were uncomfortable during the trial; (2) these jurors appeared confused during the trial; (3) in the alternate's opinion, the two jurors lacked English skills; (4) on one occasion, a juror spoke with the alternate in the hallway and said he believed defendant was not guilty of all charges; and (5) after the jury returned the verdict, the alternate asked this juror what happened and he responded the jurors were under time pressures and decided it was better to convict defendant, reasoning that someone would review their decision and order a new trial if necessary.

At the hearing on the motion, the court noted that the alternate juror did not deliberate, thus she could not provide admissible evidence regarding the deliberation process. As to her claim that another juror spoke to her about the case while the trial was proceeding, the court acknowledged it was misconduct; however, it could not determine what effect it had on the deliberations. With respect to the two jurors who allegedly could not understand English, the court suggested this was merely the opinion of the alternate juror. The court emphasized that the two jurors were questioned extensively by three attorneys during voir dire and no one had an inkling that there was a language problem. In ruling, the court stated, "[T]he motion to unseal will be denied. I don't find that the defense has met their burden with the hearsay, the opinion and the conjecture. I think it's a fishing expedition, to be honest with you."

Defendant contends the trial court erred when it refused to disclose the jurors' contact information. He asserts he had presented a sufficient showing to allow a further hearing into juror misconduct and the court improperly thwarted his ability to ferret out the facts by not providing the information necessary to attempt to speak to the jurors.

Code of Civil Procedure section 237, subdivision (b) requires that a petition for access to jurors' contact information be supported "by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." Defendant bears the burden of showing the possibility that some misconduct occurred. (See *People v. Granish* (1996) 41 Cal.App.4th 1117, 1131.) "Denial of a petition filed pursuant to Code of Civil Procedure section 237 is reviewed under the deferential abuse of discretion standard." (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.) We determine that the trial court properly exercised its discretion in determining defendant failed to make a prima facie showing of good cause.

Initially, we note that defendant's motion consisted of the declarations of counsel and a report from an investigator as to what the alternative juror told him. As noted by the trial court, defendant's showing consisted of hearsay. With respect to the declarations of counsel, they purported to report what jurors told them. And the investigator's report relayed what the alternate juror told him. "'Normally, hearsay is not sufficient to trigger

18

the court's duty to make further inquiries into a claim of juror misconduct.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 605.) Moreover, Code of Civil Procedure section 237, subdivision (b) requires the filing of a declaration to establish good cause for the disclosure of juror information. Here, the accusations of misconduct made by the alternate juror were presented through the unsworn report of an investigator and the juror did not sign the statement. As a result, without considering the merits, we could reject defendant's claim because his motion was procedurally defective.

On the merits, the statements of the alternate juror failed to provide good cause for the disclosure of juror information. She claimed two of the jurors were confused, due to their inability to understand English. As pointed out by the trial court, these jurors were the subject of much questioning by three attorneys during voir dire. We agree with the trial court that it is highly unlikely that the jurors' language difficulties would escape notice. Neither in the trial court nor on appeal did defendant address the trial court's finding on that issue. As to the alternate juror's theory as to why the deliberating jury returned guilty verdicts, her statements were inadmissible. She attempted to explain the subjective reasoning process of the jurors, which is inadmissible under Evidence Code section 1150, subdivision (a). (See *People v. Lindberg* (2008) 45 Cal.4th 1, 53 [verdict may not be impeached by inquiry into juror's subjective reasoning process].)

The one statement of the alternate juror that presented any evidence of potential misconduct was her recounting of a conversation she had with a juror in the hallway. This juror allegedly informed the alternate that he believed defendant was not guilty of any charges. Even assuming this conversation took place while the trial was in progress and not after the jury had reached its verdict (the alternate juror did not say), we must consider "'the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.'" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 256.) We conclude it was not probable that the juror's favorable comment concerning his belief that defendant was not guilty resulted in actual prejudice.

The trial court did not abuse its discretion in denying defendant's motion for the disclosure of jurors' contact information.

**VI.    The Trial Court Properly Imposed the Upper Term for the Robbery Conviction**

Defendant asserts the trial court did not state sufficient reasons for imposing the upper term of nine years for the robbery.  We disagree.

We review a trial court's sentencing decision for abuse of discretion.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  A trial court may base an upper term sentence upon any proper aggravating circumstance.  (*Id.* at p. 848.)  Here, the trial court relied on the level of violence that occurred during the robbery and found that defendant was involved in planning and inducing others to commit the crime, although he unsuccessfully attempted to disavow his participation.  All three factors are proper circumstances in aggravation.  (Cal. Rules of Court, rule 4.421(a)(1) [crime involved great violence], rule 4.421(a)(8) [crime carried out indicates planning, sophistication, or professionalism], rule 4.421(a)(4) [defendant induced others to participate or occupied a position of leadership].)

Defendant's sentence was supported by the trial court's findings.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

WILLHITE, Acting P. J.          MANELLA, J.

20