Filed 11/26/14  P. v. Yang CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>BRIAN YANG,<br><br>　　　Defendant and Appellant. | A136368<br><br>(City & County of San Francisco<br>Super. Ct. No. 21176007) |

Brian Yang was charged with first degree murder and second degree robbery in connection with the death of Gregory Chapman.  At trial, Yang asserted that a man he knew only as "Shay" robbed and shot Chapman.  Yang conceded that he drove Shay to the scene of the crime, but claimed that he did not know Shay intended to rob Chapman. Yang also asserted that Shay coerced him into participating in the robbery by threatening him with a gun.  The jury convicted Yang on both counts charged.  Yang now appeals, arguing that (1) he was denied effective assistance of counsel, (2) the trial court erred in admitting evidence that Yang had previously committed an uncharged robbery, (3) the trial court erred in admitting autopsy photographs of Chapman, (4) the prosecutor engaged in misconduct during closing argument, (5) cumulative error requires reversal, and (6) the trial court erred in failing to impose and stay the sentence for an arming enhancement.  We agree with the last argument but find the others unavailing.

1

I.

FACTS

The following facts are primarily taken from Yang's trial testimony, as well as his recorded statements during a police interrogation with Inspector Michael Philpott.[1]  On May 13, 2008, Yang was sitting in his car in the Bayview-Hunters Point area of San Francisco.  He was approached by a man he had seen a few times around the neighborhood who later introduced himself as "Shay."  Shay offered to pay Yang for a ride in his car.

The parties dispute whether Yang was aware of the purpose of the ride.  Yang initially told Inspector Philpott that "[Shay] said he had a lick for some money."  The term "lick" is slang for robbery.  Yang later told Inspector Philpott that Shay did not mention a "lick" or otherwise explain why he needed a ride.  At trial, Yang tried to explain the contradiction, stating he initially thought Inspector Philpott was asking about whether he knew of the robbery plan during the interview, not at the time he picked up Shay.  Yang also testified that he agreed to drive a stranger because he needed the money.  At the time, Yang did not have a job or a home and was living out of his car.

Shay gave Yang directions to a Mobility bus in the Lakeview District of San Francisco.  When they pulled up behind the bus, Shay said he wanted Yang to come with him.  Yang claims he initially protested, but then acquiesced because Shay showed him a gun and he feared that Shay would shoot him if he did not comply.

After Yang got out of the car, Shay instructed him to ask the occupant of the bus for "weed."  Yang and Shay then entered the bus and met Chapman, who was a stranger to Yang at the time.  Yang acted like he was trying to buy marijuana, and Chapman handed him a bag of it.  After the marijuana changed hands, Shay jumped up, pulled out

---

[1] Prior to trial, Yang moved to exclude the audio recording of the interrogation, arguing that his admissions were procured in violation of his *Miranda* rights.  The trial court denied the motion, and Yang does not challenge the ruling on appeal.

2

his gun, and told Yang to search Chapman's pockets. Chapman grabbed Yang and the two struggled to the back of the bus. Yang eventually broke free and stepped to one side.

Shay then again instructed Yang to search Chapman's pockets. Yang claims that he initially just stood there and then moved toward the front of the bus to leave, but Shay turned the gun on him. Yang stopped and raised his hands. Shay then pointed his gun back at Chapman, who also put up his hands.

Yang momentarily looked away to see if anyone was walking by, and then heard a single shot. He turned around and saw Chapman bleeding from the hand. The police later found a gunshot wound to Chapman's abdomen, but Yang claims that he did not see that wound. Once again, Shay told Yang to go through Chapman's pockets. Yang complied, found Chapman's wallet, took out the money, and handed it to Shay. Yang and Shay then returned to Yang's car and drove away from the scene. Shay directed Yang to Bayshore Boulevard, where Shay got out. Yang never saw Shay again.

The police later found Chapman bleeding from wounds to his hand and abdomen. Chapman told the officers that he had been assaulted by a black male and an Asian male, but he did not say which had a gun. After several weeks of treatment at a local hospital, Chapman died on June 3, 2008. The medical examiner opined that Chapman died from complications of multiple gunshot wounds. The examiner could not determine whether Chapman's wounds had been caused by a single gunshot or multiple shots, but stated it was possible that a single bullet could have passed through Chapman's hand and abdomen.

Crime scene investigators recovered a latent fingerprint from Chapman's sunglasses and matched it to Yang. On October 21, 2008, Yang was arrested and interrogated by Inspector Philpott.

The district attorney later charged Yang with first degree murder, second degree robbery, conspiracy to commit robbery, and attempted robbery. The last two counts were dropped before trial, and Yang was tried for murder under a theory of felony murder and attempted second degree robbery. The jury returned guilty verdicts on both counts. The jury also found that firearm enhancements were applicable to both counts.

## II.

## DISCUSSION

### A.     *Ineffective Assistance of Counsel*

Yang argues that his conviction should be reversed due to ineffective assistance of counsel.  Specifically, Yang takes issue with his counsel's failure to object to Inspector Philpott's testimony concerning Yang's veracity during his interrogation.  Yang also takes issue with defense counsel's failure to object to portions of the audio recording of his police interrogation, because the recording includes statements by Inspector Philpott concerning Yang's intent, veracity, and guilt, as well as the painfulness of Chapman's death.[2]  The Attorney General responds that defense counsel had tactical reasons for declining to object and, in any event, this evidence did not unduly prejudice Yang.  We find that, to the extent that counsel's performance was deficient, it did not prejudice Yang.

To demonstrate ineffective assistance of counsel, a defendant must show: (1) "counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms," and (2) prejudice resulted from the counsel's deficient performance, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)  A reviewing court must defer to counsel's reasonable tactical decisions, and there is a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.)  "A defendant who raises [ineffective assistance of counsel] on appeal must establish deficient performance based upon the four corners of the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)  The judgment must be affirmed "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner

---

[2] At oral argument, Yang further argued that his counsel was ineffective because he failed to object to prosecutorial misconduct at closing argument.  As set forth below, we find there was no misconduct on the part of the prosecution.

4

challenged . . . , unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Pope* (1979) 23 Cal.3d 412, 426 (overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10).)

Yang argues that counsel was ineffective because he failed to object to Inspector Philpott's trial testimony concerning Yang's truthfulness during the interrogation. At the interrogation, Yang had stated that, when he first met Shay on the night in question, Shay said "he had a lick [robbery] for some money." The prosecutor asked Inspector Philpott if he thought Yang was "telling the truth" when he made this statement. Inspector Philpott answered in the affirmative, and the prosecutor then asked if Yang later changed his answer during the interrogation. Inspector Philpott responded "[h]e goes back forth," and then explained: "Because [Yang] initially told me that this person named Shay had a lick for him . . . . So I was convinced he was telling me there was a robbery that was going to happen. And then later on he is saying he didn't know anything about a robbery. I believe he was lying to me." Yang contends that Inspector Philpott's narrative and opinions about the veracity of his story were inadmissible and would have been excluded had counsel timely objected.

Yang raises a similar point regarding counsel's failure to object to Inspector Philpott's statements on the audio recording of the interrogation played to the jury. Throughout the interrogation, Inspector Philpott questioned Yang's truthfulness, speculated about his intent, and pressed him for a confession. For example, at one point Inspector Philpott said to Yang: "Brian, without insulting you . . . I'm kinda . . . skeptical. I'm like, 'I don't know if this guy's being real with me about one part. About Shay.' " Later, Inspector Philpott commented, "I don't believe you were forced into it, though. I mean, you weren't. . . . [¶] . . . So I don't want to hear any of this 'Oh, I was afraid of him.' . . . When you left [Hunters Point], you knew you were going to Lakeview to rip off a dope dealer." Inspector Philpott also suggested that he had evidence that Shay did not exist: "I've been calling people, okay? I know people out in Hunters Point. My partner knows people out in Hunters Point. Nobody knows Shay." In response to these

5

statements, Yang continued to insist that Shay shot Chapman, and that Shay forced him to participate in the robbery.  Though, at one point Yang seemed to indicate that he knew about the robbery while he was driving Shay to Chapman's bus.

Yang also claims that counsel should have objected to Inspector Philpott's recorded statements regarding the nature of Chapman's death because they had the potential to inflame the passions of the jury.  Specifically, Inspector Philpott stated: "Mr. Chapman did not deserve to die the way he did, okay.  I think he just, he was driving the Mobility bus and he had a little hustle on the side, okay."  During the interrogation, Inspector Philpott also showed Yang photographs of Chapman's body, commenting: "Looks like a painful death, no?" [3]

As Yang points out, investigating officers are generally not permitted to testify concerning the veracity of a witness's statement, and the prosecution cannot restate its case through police interrogation transcripts.  For example, in *People v. Sergill* (1982) 138 Cal.App.3d 34, 41, the trial court permitted a police officer who interviewed the underage victim to testify concerning the victim's veracity.  Further, within the presence of the jury, the trial court stated that the officer was especially qualified to render an opinion in this area.  (*Ibid.*)  We reversed, holding that the officer's statements usurped the jury's function as fact finder.  (*Ibid.*)  In *People v. Sanders* (1977) 75 Cal.App.3d 501, 507–508, the court reversed where the trial court admitted a transcript of the defendant's police interrogation that largely consisted of narrative statements by the investigating officer.  The court reasoned that the officer's statements were often double hearsay, and the state improperly tried to use those statements to rehabilitate their badly impeached witnesses.  (*Ibid.*)

---

[3] In connection with his ineffective assistance of counsel argument, Yang also points to Philpott's recorded comments to Yang regarding the felony-murder rule, specifically: "[Chapman] died in the commission of a robbery, okay?  You tried to rob him and then that's the felony murder rule. . . .  That's beyond . . . that's like a homicide plus."  However, defense counsel did object to this statement. After weighing the evidence pursuant to Code of Civil Procedure section 352, the trial court allowed the jurors to hear the statement, but instructed them that they should follow the court's definition of felony murder, not Inspector Philpott's.

6

Likewise, in this case, Inspector Philpott's trial testimony regarding Yang's veracity during the interrogation constituted inadmissible hearsay and lay opinion that merely restated the prosecution's theory of the case. While Yang's statements at the interrogation regarding the "lick" may have been contradictory, it was the sole province of the jury to determine whether he was telling the truth. As the Attorney General points out, Yang's statements on the recording are admissible as party admissions (Evid. Code, § 1220), and Inspector Philpott's questions and assertions sometimes provide context for those admissions. However, many of Inspector Philpott's leading questions and accusatory comments are unnecessary to understand Yang's responses, had the potential to inflame the passions of the jury, and would not survive scrutiny under Evidence Code section 352. At the very least, counsel could have requested a limiting instruction.[4]

But that does not end the inquiry. "Generally, failure to make objections is a matter of trial tactics as to which we will not exercise judicial hindsight. . . . 'It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively . . . Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics.' " (*People v. Lanphear* (1980) 26 Cal.3d 814, 828 (overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610).) Here, the Attorney General argues that defense counsel had tactical reasons for declining to object to the introduction of Inspector Philpott's aggressive questioning. The Attorney General points out that Yang maintained his innocence throughout the interrogation despite Inspector Philpott's accusations, and contends that Yang's resolve could have convinced the jury of his credibility and that a limiting instruction might have only highlighted the inspector's opinions. The Attorney General also asserts that defense counsel declined to object to Inspector Philpott's trial

---

[4] The Attorney General argues that there was nothing inappropriate or unconstitutional about Inspector Philpott's interrogation techniques. But Yang is not arguing that Inspector Philpott violated his Fifth Amendment rights, but that Inspector Philpott's statements were inadmissible at trial.

testimony concerning Yang's veracity because that testimony somehow provided favorable context. Yang responds that the Attorney General's theory is inconsistent, as it posits that counsel wanted to both highlight Inspector Philpott's aggressive questioning and downplay his opinions.

We agree with the Attorney General that tactical decisions could have motivated defense counsel's decision not to object to at least some of the challenged evidence. During closing argument, defense counsel highlighted Inspector Philpott's attempts to impose his view of the facts on Yang during the interrogation: "Inspector Philpott . . . is present and he's pressing. . . . [¶] . . . But I am suggesting that he blocks Brian [Yang] from explaining, . . . [¶] So . . . Inspector Philpott is not so much asking the question but just telling them." Counsel also pointed out Yang's attempts to protest his innocence at the interrogation: "So . . . when I listen to the [audio recording] . . . it feels more like an arm-wrestling match to me: [¶] 'You knew.' [¶] 'I didn't know.' [¶] 'You knew." Counsel continued: "So Brian is there, having tried to tell the inspectors 'no, no, no,' time and again. But they keep asking."

Although defense counsel may have declined to object to Inspector's Philpott's narrative on the recording so as to provide the jury with additional context, we fail to see any tactical reason for declining to request a limiting instruction. We also fail to see a tactical reason for declining to object to Inspector Philpott's testimony that Yang lied about his ignorance of the "lick." This testimony provided no favorable context and merely restated the prosecution's position.

In any event, to the extent that there is no satisfactory explanation for counsel's failure to request a limiting instruction or to object to Inspector Philpott's trial testimony, we find that it is not reasonably probable that the jury would have reached a different verdict if objections had been made. The prosecution's case was strong. Yang admitted to giving Shay a ride to and from the scene of the crime. He also admitted to actively participating in the robbery. Yang's defense was that he acted under duress and that he did not have prior knowledge of the robbery. But the notion that Yang voluntarily agreed to give Shay a ride and was then forced to actively participate in a crime is hard to accept.

Moreover, Yang's admissions often contradict his story. For example, at least twice during his interrogation, Yang indicated that he knew about the robbery beforehand. While Yang tried to backtrack during the interrogation and at trial, these inconsistencies raised credibility issues that would have been apparent even without Inspector Philpott's opinion. Based on Yang's own admissions, the jury could have reasonably concluded that he had prior knowledge of the robbery, and that he voluntarily participated.

### B. Evidence of Uncharged Crimes

Yang argues that the trial court erred in admitting evidence of uncharged crimes at trial. During his recorded police interrogation, Yang admitted to robbing other drug dealers on less than five occasions prior to the incident with Chapman. Before trial, Yang moved to exclude this evidence, arguing that the prior robberies were inadmissible under Evidence Code sections 1101, 350, and 352 and that admission of the evidence would violate his rights to a fair trial. The motion was granted in part and denied in part. The trial court allowed the admission of one of the robberies for the limited purposes of proving Yang's intent and impeaching his credibility. Yang's discussion of the other robberies was redacted. In the recording played for the jury, Yang admitted to using a gun to rob a marijuana dealer in Hunters Point around six months before the robbery of Chapman. Yang also admitted to the prior robbery during direct and cross examination.

Evidence Code section 1101, subdivision (a) provides that evidence of a person's character "is inadmissible when offered to prove his or her conduct on a specified occasion." "The purpose of the rule is to avoid placing the accused in a position of having to defend against crimes for which he has not been charged and to guard against the probability that evidence of other criminal acts having little bearing on the question whether defendant actually committed the crime charged would assume undue proportions and unnecessarily prejudice defendant in the minds of the jury, as well as promote judicial efficiency by restricting proof of extraneous crimes." (*People v. Kelley* (1967) 66 Cal.2d 232, 238–239.)

Evidence Code section 1101, subdivision (b) sets forth an exception to the general rule where evidence of a prior crime is introduced to prove some fact other than the

9

defendant's disposition to commit the act, including intent. Our Supreme Court has explained " 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent.' " (*People v. Robbins* (1988) 45 Cal.3d 867, 879.) "The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must [have] had the intent attributed to him by the prosecution." (*Ibid.*) Where the evidence of an uncharged crime is offered to prove intent, the similarity between the charged and uncharged offenses must be substantial, but the prosecution need not show the same quantum of similarity as when the uncharged crime is used to prove identity. (*Id.* at p. 880.)

Yang contends that the similarities between the uncharged and charged offenses were not substantial enough to support the admission of the uncharged offense. We disagree. Both offenses involved the robbery of a marijuana dealer, and both also involved a gun. Additionally, the two offenses took place only a few months apart. As Yang points out, there were also differences. The robberies took place in different neighborhoods of San Francisco; the uncharged robbery involved one perpetrator, while the charged robbery involved two; and a gun was fired in the charged robbery but not in the uncharged one. But the charged and uncharged offenses need not be practically identical to warrant the admission of the uncharged offense. (See *People v. Denis* (1990) 224 Cal.App.3d 563, 568 [that appellant did not shoot anyone during prior robberies "hardly destroy[ed] the logical inference that appellant intended to rob [the victim]"].)

Yang further argues that the trial court erred in not excluding evidence of his prior robbery under Evidence Code section 352. Section 352 provides that a trial court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. "[T]he trial court's ruling under section 352 will be upset only if there is a clear showing of an abuse of discretion." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.) We find no abuse of discretion here. The probative value of the

prior robbery was high in light of its similarities to the charged crime. Moreover, the evidence did not create a substantial danger of undue prejudice to Yang since the trial court admitted only one of the approximately five uncharged robberies and instructed the jury that it was admitted for the limited purpose of proving intent and impeaching Yang's credibility. Contrary to Yang's contention, it was unlikely that the jury would be inclined to punish Yang for an uncharged robbery by convicting him for felony murder.

Accordingly, we find that the trial court did not err in admitting evidence of Yang's uncharged robbery.

### C.     *Autopsy Photographs*

The trial court admitted two autopsy photographs over the objection of Yang. The pictures were taken more than three weeks after Chapman was shot, and two days after he died. The first picture is of Chapman's torso and shows the gunshot entrance wound, which was enlarged by surgeons during treatment. It also shows a large open stomach wound, which was created by the treating doctors, several surgical sutures, and four drainage tubes protruding from Chapman's neck. The second depicts Chapman's mutilated right hand. There is large hole between the thumb and the wrist caused by the gunshot wound, as well as multiple operations, and the thumb is tenuously attached to rest of the hand by soft tissue. As a result of surgical intervention, the medical examiner that performed the autopsy could not locate the original gunshot wound to the hand.

Yang argues that the trial court abused its discretion under Evidence Code section 352 by admitting these photographs. We agree. "Autopsy photographs have been described as 'particularly horrible,' and where their viewing is of no particular value to the jury, it can be determined the only purpose of exhibiting them is to inflame the jury's emotions against the defendant." (*People v. Marsh* (1985) 175 Cal.App.3d 987, 997– 998.) In this case, the autopsy photographs are upsetting, as they show open wounds and a mangled hand. Moreover, they have little probative value. There was no dispute that Chapman suffered gunshot wounds to the abdomen and right hand, and the wounds in the photographs bear little resemblance to Chapman's wounds at the time of the robbery.

11

The holes in Chapman's abdomen and hand were enlarged through surgery, and the autopsy photographs depicted surgical wounds created well after the shooting.

The Attorney General's arguments on this point are unpersuasive. She first contends that the photographs were relevant insofar as the pathologist could not determine if a single bullet passed through Chapman's hand and abdomen, or if Chapman's wounds were caused by two different bullets. But the autopsy photographs do nothing to clarify the matter, and in any event, both Yang and the prosecution asserted that Chapman was shot only once. Next, the Attorney General argues that the photographs show that the angle of the gunshot was inconsistent with Yang's claim that Shay shot Chapman from a distance, and that the photographs undermine Yang's claim that he did not realize Chapman suffered life-threatening injuries. However, it is unclear how these photographs shed any light on the angle of the gunshot or the visibility of Chapman's wounds at the time of the shooting, especially since the wounds depicted in the photographs were drastically altered as a result of medical treatment.

While the court abused its discretion in admitting the autopsy photographs, there was no prejudice. The photographs were not extraordinarily gruesome and they did not show Chapman's head or face. There is no indication that the photographs were displayed for an extended period of time, and the prosecutor did not comment on them in a manner that would inflame the passions of the jury.

### D. *Prosecutorial Misconduct*

Yang argues that the prosecutor engaged in misconduct during her closing argument by referring to evidence outside the record, appealing to the sympathies and passions of the jury, and by invoking her integrity and the integrity of her office. The Attorney General responds that Yang waived these challenges by failing to object to the prosecutor's closing arguments at trial, and that in any event, there was no prosecutorial misconduct. We agree with the Attorney General that there was no misconduct.

12

First, Yang takes issue with the following arguments made during the prosecutor's closing:

> "If there is one thing this case not about, it is sympathy. . . . [¶] I am not standing here trying to make you feel sorry for the victim. And you can't feel sorry for the defendant. . . . [¶] My job is to be fair and impartial. That is my duty to you. . . . [¶] My job is not to try to sway your emotions to make you feel sorry for anybody in this case. . . .
>
> You might be wondering, how come we didn't hear anything about Mr. Chapman's life? Who is this man whose death we are here to talk about? Who is he? Where is he from? What did he do? You didn't hear any of that.
>
> And you didn't hear any of that because it is my job not to prejudice you. I don't you to be swayed by emotion. I want you to base your verdict on just the evidence."

Yang argues that the prosecutor improperly tried to bolster her case and her credibility by claiming that she had a duty to be fair and impartial. Yang also contends that the prosecutor implied to the jury that she withheld information that showed Chapman was deserving of sympathy.

Yang contends that the prosecutor further appealed to the passions of the jury by discussing sympathy as it related to Yang. Specifically, Yang takes issue with the following statements made at closing argument:

> "Do you remember early on during voir dire there was a juror . . . [who] said she felt sorry for [Yang?] . . . [¶] If she knew then what you know now . . . would she have been feeling sorry for him? How could anyone possibly feel sorry for the defendant. He is covering up for a murderer. He committed a murder with his friend. They took what didn't belong to them. . . . [¶] There is no place in a criminal courtroom for sympathy to get in the way. It has no place. And there is no room in the human heart to feel sorry for someone who robs and murders someone. You can't feel sorry for the defendant. There is no room for that. Nobody would feel sorry for him."

13

Yang argues that whether or not he is deserving of sympathy is irrelevant to his guilt and that the sole purpose of these comments was to inflame the jury's passions against him.

Prosecutors are held to an elevated standard of conduct because of the unique functions they perform in representing the People in criminal trials. (*People v. Hill* (1998) 17 Cal.4th 800, 819–820.) As they represent the People, prosecutors not only have an interest in winning a case but also in ensuring that justice is done. (See *Berger v. United States* (1935) 295 U.S. 78, 88.) It is misconduct for prosecutors to bolster their case or vouch for the credibility of a witness by invoking their personal prestige or the prestige and reputation of their office. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.) Nor may prosecutors attempt to bolster their case by reference to facts outside the record. (*People v. Huggins* (2006) 38 Cal.4th 175, 206.) When assessing claims of prosecutorial misconduct, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Here, the prosecutor stepped very close to the line when she discussed her duty to be fair and impartial. While prosecutors do have a duty to see that a defendant gets a fair and impartial trial (*People v. McCracken* (1952) 39 Cal.2d 336, 349), it is difficult for them to fulfill that duty when they boast about it to the jury. Nevertheless, in light of the context, it is not reasonably likely that the jury construed these comments in an objectionable fashion. The prosecutor did not try to use the prestige of her office to bolster the credibility of a witness or to vouch for her case. Instead, she properly urged the jury to set aside sympathy and base its verdict on "just the evidence." (See CALCRIM No. 200.) While her choice of words was poor, we cannot conclude that her statements amounted to prosecutorial misconduct.

Contrary to Yang's contention, this case is distinguishable from *People v. Alvarado* (2006) 141 Cal.App.4th 1577, where the court found prosecutorial misconduct. In that case, the defense counsel argued at closing that the prosecution's witnesses had

14

been coached. (*Id.* at pp. 1582–1583.) On rebuttal, the prosecutor told the jury that she had taken an oath not to prosecute a case if she had any doubt that a crime had occurred, that the defendant committed the crime, and that she would not risk her professional career by coaching a witness. (*Id.* at p. 1583.) In contrast, in this case, the prosecutor did not reference her duties in order to vouch for a witness or a particular piece of evidence. She merely encouraged the jury to consider nothing more than the record before them.

For similar reasons, we find that the prosecutor did not engage in misconduct by stating that she declined to introduce evidence about Chapman's life. Yang argues that the prosecution implied to the jurors that she could have introduced evidence that showed Chapman was deserving of their sympathy. Again, context matters. The prosecutor did not say whether or not Chapman was a sympathetic victim, and in any event, she expressly stated that Chapman's character was irrelevant and that the jury should base its verdict on the evidence alone. We find that it is not reasonably likely the jury would do the opposite and convict Yang because evidence that was neither introduced nor described might show that Chapman was a sympathetic victim.

We also find that the prosecutor did not engage in misconduct by arguing that Yang was not deserving of the jury's sympathy. During closing, a prosecutor is not "required to discuss his [or her] view of the case in clinical or detached detail." (*People v. Panah* (2005) 35 Cal.4th 395, 463.) Though a prosecutor may not appeal to jurors' sympathy for the victim (*People v. Fields* (1983) 35 Cal.3d 329, 362), the prosecutor has wider latitude when discussing the defendant. For example, "[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct," so long as these arguments "are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1021.) Thus, our Supreme Court found no misconduct where a prosecutor described a defendant as " 'a despicable excuse for a man' " during the guilt phase of a trial. (*Ibid.*) Here, the

15

prosecutor merely asserted that Yang did not deserve sympathy because he committed a crime, while also encouraging the jury to base its verdict on the evidence.

### E. *Cumulative Error*

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.) Thus, we must determine whether, taken together, defense counsel's failure to object to certain evidence and the trial court's erroneous admission of autopsy photographs warrant reversal. (See sections III.A & III.C *ante*.) We conclude that they do not. As discussed above, the prosecution had a strong case. Yang admitted to participating in the robbery and the jury had ample reason to conclude that he did not participate under duress. Moreover, the isolated issues now raised by Yang did not result in substantial prejudice or render his trial fundamentally unfair.

### F. *Sentencing*

The trial court imposed a three-year prison sentence in connection with Yang's conviction for second degree robbery and stayed that sentence pursuant to Penal Code section 654. However, the trial court failed to impose a sentence for the corresponding firearm enhancement. Both Yang and the Attorney General assert that the trial court erred and should have imposed a stayed sentence for the enhancement. We agree. "Where the base term of a sentence is stayed under section 654, the attendant enhancement must also be stayed." (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709.) We remand to correct this error.

III.

DISPOSITION

We affirm Yang's convictions for murder and second degree robbery, but we remand for the imposition and stay of the sentence for the firearm enhancement.

16

_____
McGuiness, P.J.

We concur:


_____
Pollak, J.


_____
Siggins, J.